**CHRISTIE S. TOTTEN, OSB #085890**
christietotten@dwt.com
**JANDEE WALLIS, OSB #244454**
jandeewallis@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
Telephone:  (503) 241-2300
Facsimile:  (503) 778-5299

     Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **VICKI HEISEN**, an individual,<br><br>       Plaintiff,<br><br>  v.<br><br>**LEGACY HEALTH,** an Oregon non-profit corporation,<br><br>       Defendant. | Case No. 3:25-cv-00197-AB<br><br>**DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>**(Oral Argument Requested)** |

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF UNDISPUTED FACTS ....................................................... 2

    A.  The Parties ................................................................................................ 2

    B.  Plaintiff's employment at Legacy ............................................................ 3

        1.  Plaintiff's responsibilities and Legacy's expectations .............................. 3

        2.  Plaintiff's history of critical performance feedback ................................. 4

    C.  Plaintiff's employment in 2022 ............................................................... 7

    D.  Legacy receives, and follows up on, employee complaints (2022) ........................ 7

        1.  Multiple staff report concerns about Plaintiff, and Crownhart investigates. ................................................................................. 8

    E.  Legacy delivers performance feedback and Written Corrective Action, which Plaintiff disputes. ................................................................ 11

    F.  Plaintiff emails a grievance letter ...................................................... 13

    G.  Crownhart receives additional staff complaints and appropriately follows up ..... 14

    H.  Staff continue reporting concerns, and Plaintiff receives a Final Corrective Action removing her from people management and giving an option to avoid termination, and she chooses employment outside Legacy. ....................................................................... 17

        1.  Plaintiff receives a Final Corrective Action with 30 days to find a non-managerial position, in lieu of termination. ................................ 17

        2.  Plaintiff chooses not to seek a Legacy position and accepts employment elsewhere before the 30-day period expires ........................ 18

III.  LEGAL STANDARD ......................................................................................... 19

IV.  ARGUMENT ....................................................................................................... 20

    A.  Plaintiff's FMLA and OFLA Interference Claims Fail as a Matter of Law (First and Second Claims). ........................................................ 20

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

1.    Temporal proximity alone cannot establish causation.............................. 21

2.    Intervening events break any causation inference ................................... 22

B.    Plaintiff's Hostile Work Environment Claim Fails as a Matter of Law (Third Claim). ................................................................................................... 23

1.    Plaintiff lacks evidence of harassment because of disability. .................. 23

2.    Plaintiff cannot meet the "severe and pervasive" standard. ..................... 25

C.    Plaintiff's Disability Discrimination Claim Lacks Merit (Fourth Claim). ........... 26

1.    Plaintiff must establish that she was a qualified person with a disability............................................................................................... 26

2.    Plaintiff lacks evidence indicating alleged adverse acts because of a disability............................................................................................... 26

3.    Plaintiff was removed from management for legitimate, nondiscriminatory reasons................................................................................................. 27

D.    Plaintiff's Retaliation Claims Fail as a Matter of Law (Fifth through Ninth Claims). .................................................................................................. 28

1.    No adverse action sufficiently supports Plaintiff's "pre-termination retaliation" claim (Eighth Claim)............................................................. 28

2.    Plaintiff cannot meet the third element of causation on any of her remaining retaliation claims.................................................................... 31

3.    Legacy's legitimate reasons for the FCA Actions require Plaintiff to establish pretext. .................................................................................. 33

V.    CONCLUSION............................................................................................. 33

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................................20

*Arigbon v. Mult. Cnty.*,
2010 WL 2038839 (D. Or. May 20, 2010) ........................................................................29

*Biggs v. City of St. Paul*,
2019 WL 4575839 (D. Or. Mar. 7, 2019) ..........................................................................32

*Bradley v. Harcourt, Brace & Co.*,
104 F.3d 267 (9th Cir. 1996) .............................................................................................28

*Buhagiar v. Wells Fargo Bank, N.A.*,
2024 WL 2931427 (9th Cir. June 11, 2024) ......................................................................28

*Carter v. Fred Meyer Jewelers, Inc.*,
2019 WL 2744190 (D. Or. Apr. 10, 2019) ...................................................................21, 22

*Clark Cnty. Sch. Dist. v. Breeden*,
532 U.S. 268 (2001).............................................................................................................31

*Cohen v. Fred Meyer, Inc.*,
686 F.2d 793 (9th Cir. 1982) .............................................................................................30

*Cozzi v. Cnty. of Marin*,
787 F. Supp. 2d 1047 (N.D. Cal. Apr. 18, 2011)...............................................................31

*Cummings v. Valley Health Sys., LLC*,
705 F. App'x 529 (9th Cir. 2017) ......................................................................................33

*Curley v. City of North Las Vegas*,
772 F.3d 629 (9th Cir. 2014) .............................................................................................22

*Far Out Prods., Inc. v. Oskar*,
247 F.3d 986 (9th Cir. 2001) .............................................................................................19

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998)............................................................................................................26

*Gustafson v. U.S. Dep't of Energy*,
2023 WL 3688077 (D. Or. Mar. 13, 2023)........................................................................21

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

*Herman v. Port of Astoria*,
2015 WL 7720500 (D. Or. Nov. 28, 2015)................................................................31

*Howard v. Milwaukie Convalescent Hosp., Inc.*,
2008 WL 4117167 (D. Or. Aug. 25, 2008)................................................................22

*Jackson v. City of Yachats*,
2025 WL 3524372 (D. Or. Dec. 9, 2025) ...............................................23, 25, 27, 31

*Jacobson v. Carlton Hair*,
2011 WL 13112239 (C.D. Cal. Jan. 31, 2011) .........................................................21

*Jernigan v. Alderwoods Grp., Inc.*,
489 F. Supp. 2d 1180 (D. Or. 2007) ........................................................................26

*Johnson v. Chevron Corp.*,
2009 WL 1404699 (N.D. Cal. May 19, 2009)...........................................................25

*Johnson v. Jondy Chems., Inc.*,
2017 WL 1371271 (D. Or. Apr. 13, 2017) ...............................................................21

*Kama v. Mayorkas*,
107 F.4th 1054 (9th Cir. 2024) .........................................................................32, 33

*Kelly v. Boeing Co.*,
400 F. Supp. 3d 1093 (D. Or. Aug. 15, 2019) .........................................................26

*Kim v. Prudential Fin., Inc.*,
2016 WL 2595477 (D. Or. May 4, 2016) .................................................................26

*Lyzer v. Caruso Produce, Inc.*,
2019 WL 7206449, at *3 (D. Or. Sep. 9, 2019), *adopted in relevant part by* 2019 WL
5960655 (Nov. 13, 2019)...............................................................................26, 29

*Manatt v. Bank of Am., NA*,
339 F.3d 792 (9th Cir. 2003) ..................................................................................23

*Mathieson v. Yellow Book Sales & Distrib. Co., Inc.*,
2008 WL 2889398 (D. Or. July 21, 2008)...........................................................21, 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................................................................19

*Mattioda v. Nelson*,
98 F.4th 1164 (9th Cir. 2024) ............................................................................23, 25

Page ii – TABLE OF AUTHORITIES

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ................................................................................................20, 21

*Mejia v. Lamb Weston, Inc.*,
  2020 WL 363387 (D. Or. Jan. 22, 2020) ......................................................................29

*Nelson v. Pima Cmty. Coll.*,
  83 F.3d 1075 (9th Cir. 1996) .......................................................................................24

*Nunez v. City of Los Angeles*,
  147 F.3d 867 (9th Cir. 1998) .......................................................................................31

*Pool v. Vanrheen*,
  297 F.3d 899 (9th Cir. 2002) .......................................................................................30

*Powell v. Noem*,
  2025 WL 2814698 (9th Cir. Oct. 3, 2025)....................................................................33

*Rieman v. Evraz Inc., NA*,
  2019 WL 13241465 (D. Or. June 25, 2019) .................................................................21

*Sereno-Morales v. Cascade Food, Inc.*,
  819 F. Supp. 2d 1148 (D. Or. May 12, 2011) ..............................................................30

*Sheridan v. Providence Health & Servs.-Oregon*,
  2011 WL 13250762, at *14 (Sep. 6, 2011), *adopted by* 2011 WL 6887160 (D. Or. Dec. 29,
  2011). ..........................................................................................................................25

*Tchir v. Unified W. Grocers Inc.*,
  135 F. App'x 39 (9th Cir. 2005) ..............................................................................28, 29

*Vasquez v. Cnty. of Los Angeles*,
  349 F.3d 634 (9th Cir. 2003) .......................................................................................25

*Wallis v. J.R. Simplot Co.*,
  26 F.3d 885 (9th Cir. 1994) .........................................................................................20

*Yartzoff v. Thomas*,
  809 F.2d 1371 (9th Cir. 1987) .....................................................................................20

*Zsenyuk v. City of Carson*,
  99 F. App'x 794 ...........................................................................................................21

**State Cases**

*Summerfield v. Or. Liquor Comm'n*,
  366 Or. 763 (2020) .....................................................................................................29

Page iii – TABLE OF AUTHORITIES

**Federal Statutes**

42 U.S.C. § 12112.................................................................................................................23

**State Statutes**

ORS
653.606(3)(b) .................................................................................................32
653.641................................................................................................28, 32
659A.030...............................................................................................29
659A.030(1)(f) ......................................................................28, 29, 31, 33
659A.030(1)(g) .........................................................................................28
659A.109..............................................................................28, 29, 31, 32
659A.112...............................................................................................23, 26
659A.199..............................................................................28, 29, 31, 33

**Rules**

Fed. R. Civ. P. 56 ...............................................................................................................1

Fed. R. Civ. P. 56(a) .......................................................................................................19

**Other Authorities**

*Supra*, § IV.B.1 ...............................................................................................................24

*Supra,* § IV.D.1.b .............................................................................................................33

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main ☐ (503) 778-5299 fax

## LOCAL RULE 7–1(a) CERTIFICATION

Counsel for Defendant ("Defendant" or "Legacy") certifies the parties made a good faith effort through telephone conferral on January 21, 2026 to resolve the disputes in this Motion and were unable to do so.

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, Defendant respectfully moves for judgment in its favor on all claims brought by Plaintiff. Defendant's Motion is supported by the following Memorandum; the concurrently filed declarations of Christie S. Totten, Heather Crownhart, Peter Tranby, and the designated exhibits thereto; and the Court's file.

## MEMORANDUM OF LAW

### I.  INTRODUCTION

This is an employment case. Plaintiff was Clinic Manager of Legacy's Northeast Internal Medicine Clinic ("Northeast IM Clinic"), responsible for leading staff and running day-to-day clinic operations. In the fall of 2022, Plaintiff's new Director received voluminous, ongoing concerns from multiple staff members about Plaintiff's performance and conduct as a leader, and reports that people were leaving or planning to leave their jobs. Legacy first provided feedback to Plaintiff, then issued a Written Corrective Action, and then finally issued a Final Corrective Action in December 2022 which provided a (partially paid) leave in order to find a new, non-managerial job at Legacy within 30 days to avoid termination. Plaintiff disagreed with staff feedback and got a job elsewhere.

Plaintiff asserts nine legal claims, all focused on a leave of absence for knee surgery in the summer of 2022 and on alleged retaliation for allegedly opposing treatment related to the same. All claims fail. Plaintiff cannot rely on timing or speculation to support her claims. Without specific facts to carry her burden, the undisputed evidence shows no genuine dispute of material fact at issue.

Page 1 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

Because Legacy's Motion relies on Plaintiff's own sworn testimony and supplemental evidence where she lacks knowledge, there can be no genuine dispute of material fact, and summary judgment is appropriate.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

### A.    The Parties.

**Defendant Legacy Health** is a nonprofit, multi-hospital health system that provides comprehensive healthcare services, including through its busy Northeast IM Clinic on the Emanuel Medical Center campus in North Portland.  (Declaration of Christie Totten, ¶ 2, Ex. 1, Deposition of Vicki Heisen (hereinafter "Pl. Dep."), 11:17-12:3, 137:3-8; Declaration of Heather Crownhart, ¶ 4.)

With more than 14,000 employees, Legacy is responsible for managing employee performance and delivering corrective action.  Under its policies, the particular corrective action delivered depends on the severity and context, and does not necessarily progress sequentially through all possible progressive discipline steps.  (Declaration of Peter Tranby, ¶ 4, Ex. 1, LHS000737.)  Legacy also maintains comprehensive policies, including anti-discrimination, anti-retaliation, anti-harassment policies, and leaves of absence policies and procedures.  (*Id.* ¶ 3.)

Legacy hired **Plaintiff Vicki Heisen** in 2012 as a Clinic Manager.  (Pl. Dep., 11:8-16.)[2] Plaintiff received a Final Corrective Action on December 28, 2022, which removed her from the manager position and provided 30 days to seek a non-managerial position within Legacy.  (*Id.*, 266:9-17, Ex. 23, LHS000439.)  Plaintiff never explored such positions, instead taking a job with a new employer in January 2023.  (*Id.*, 286:10-287:11, 305:21-306:4.)  After she notified Legacy

---

[1] Legacy denies Plaintiff's characterization of facts, but accepts them as true solely for purposes of this Motion.  Plaintiff's claims fail even based on her own evidence.  Legacy will dispute Plaintiff's allegations if this case proceeds to trial.

[2] Totten Declaration attaches deposition transcripts and exhibits thereto.

Page 2 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

of her new job, Legacy separated her employment effective February 2, 2023. (*Id.*, 287:12-17, Ex. 25.)

### B. Plaintiff's employment at Legacy.

Plaintiff was a Clinic Manager throughout her employment. (*Id.*, 11:8-16.) She understood her job duties, and she understood Legacy's policies and where to find them. (*Id.*, 40:10-19.) Her direct supervisor was at the Director level: originally Maryana Thompson, then Trish Mason, and then Heather Crownhart beginning in September 2022. *(Id.*, 14:1-7; Totten Decl., ¶ 4, Ex. 3, Deposition of Heather Crownhart (hereinafter "Crownhart Dep."), 12:8-13:1.)

### 1. Plaintiff's responsibilities and Legacy's expectations.

Plaintiff's key job functions as Clinic Manager included building a cohesive and functional team, and building and maintaining a work environment reflecting high employee satisfaction, competence, and teamwork. (Pl. Dep. 32:19-23, 33:8-34:13, Ex. 1.) Staff should learn from her. (*Id.*, 13:23-25.) It was important that Plaintiff promote morale and an orderly workplace. (*Id.*, 42:20-43:1.) It was also important that Plaintiff both avoid playing favorites with staff and take steps to avoid a perception of favoritism. (*Id.*, 43:16-25.) In an always-busy clinic with many patients, her Clinic Manager role was "very important." (*Id.*, 32:16-18, 137:3-8.)

Plaintiff's duties included overseeing staff (hiring, onboarding and training, managing performance), and managing the day-to-day. (*Id.*, 30:20-31:7; 43:11-15.) She was responsible for daily "huddles" where staff discussed daily clinic happenings and items going well or needing improvement. (*Id.*, 30:20-31:2, 39:6-16.) It was critical that staff felt comfortable raising potential issues during daily huddles, and that staff did not feel it was a time to be scolded by the Clinic Manager. (*Id.*, 39:17-40:4.) A Clinic Manager should be honest, trustworthy, promote teamwork, be available for employees so they feel they can approach her, and be seen as fair. (*Id.*, 31:8-20, 41:24-42:6.) Simply put, Plaintiff's job was supporting and leading a busy staff. (*Id.*, 31:8-10.)

Page 3 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

As leader, Plaintiff's presence in the clinic was "incredibly important"—her job "absolutely" required significant open-door presence in the clinic. (*Id.*, 39:1-5, 199:18-22.) It was "critical" that the Clinic Manager had a consistent schedule and that people knew how to contact her. (*Id.*, 53:7-11.)

Plaintiff, a salaried exempt employee, knew her core work schedule was based on clinic hours. (*Id.*, 40:20-41:7.) In 2022, the clinic was open 7:45 am to 5:00 pm, though some employees stayed after 5:00 pm. (*Id.*, 41:9-12.)

### 2. Plaintiff's history of critical performance feedback.

Plaintiff received both positive and critical feedback during her employment.

#### a. Plaintiff receives performance feedback, including about her availability and treatment of staff (2013-2015).

In her FY-2014 performance review, Plaintiff received positive feedback. She also received critical comments on several themes: having *familial* relationships with staff, lacking professional *boundaries,* being *present and engaged*, having perceived *unavailability* to staff, and needing to *communicate her schedule*. (*Id.*, 51:4-52:7, Ex. 3, LHS000228-229, LHS000235.)[3]

---

[3] Including: her "*approach with her staff is often to treat them like her family...[which can] have a negative impact on her ability to effectively manage her team*"; to work on professional boundaries with staff; and that she "*could benefit by being more present and engaged in the clinic. There are perceptions that she is not available to staff and physicians, which I believe she can overcome by being more purposeful in her communications about her work plan and schedule.*" (Pl. Dep. 51:4-52:7, Ex. 3, LHS000228, LHS000235.)

Page 4 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

Her FY-2015 review included more critical feedback regarding **accountability**, **presence**, **communication**, loss of staff **trust**, receiving **constructive feedback**, and avoiding inappropriate **offhand comments**. (*Id.*, 54:13-56:24, Ex. 4, LHS000261-262, LHS000267.)[4]

Plaintiff disagreed with feedback and testified in deposition that multiple employee concerns were lies.[5]   However, she agreed that she must set the bar higher for herself as a leader than other staff. (*Id.*, 58:18-59:3.)  And Plaintiff took steps in 2015 and afterward to avoid treating staff like family: "I was aware of my actions." (*Id.*, 52:11-18.)  Plaintiff also began posting her daily schedule on her door, in response to feedback that staff needed to know her whereabouts. (*Id.*, 56:1-14.)

    **b. Plaintiff is placed on a Performance Improvement Plan (2015).**

In June 2015, Legacy issued a Performance Improvement Plan ("PIP"), which provided a 30-day action plan to improve as Clinic Manager to avoid termination. (*Id.*, 62:12-15, 62:24-63:11, Ex. 5.)  The PIP included:

- Objective 1: Communication:

    o  Feedback including: "*No one knows your schedule.  You say you are 'leaving for a minute and will be right back, but then do not return for the rest of the day'*"; inconsistent and ineffective communication with staff; body language, voice, and tone not conveying a supportive manner; addressing conflict by engaging staff and physicians in public work areas

---

[4] Including: Plaintiff needs "*to work on accountability—She is the leader and if staff do not feel she is present and working hard they will not feel need to be present and working hard*"; physically posting her schedule and communicating whereabouts is helpful; "*she has lost some trust of staff*"; she "*[n]eeds to learn that goal of feedback is constructive and use the information for improvement, work on not getting defensive and taking it personally;*" she "*needs to be conscious that some of her off hand comments made in public area would be best avoided or only voiced in private—some of the staff feel her comments are insulting to them and if overheard by other staff and/or patients does not set the right tone.  She is the leader so needs to set the bar higher for herself than any of her staff.*") (*Id.*, 54:13-55:9, Ex. 4, LHS000261-262.)

[5] For example, Plaintiff denied reporting that she told clinic employees she was called "Dr. Jekyll and Mr. Hyde and Mrs. Hatchet" at a former job. (*Id.*, 59:17-61:11, Ex. 4, LHS000267.)

Page 5 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

despite being asked to use her office; and making inappropriate comments. (*Id.,* Ex. 5, LHS000863-864.)

- o Expected Performance: post schedule on her door, tell others when she was leaving and would return, and "*Be present in the clinic as much as possible. It is not sufficient to say 'you can always reach me on my cell phone'*"; lead daily huddles and organize information and agendas; be aware of body language and inclusive communication; communicate clearly; and be "cautious about saying what you are thinking" to set the tone for professional collaboration and communication.  (*Id.*)

- Objective 2: Human Resource Management.
  - o Feedback including: inappropriately sharing information with staff; "target[ing]" staff members who do not meet expectations; "*The expectations for each person in our clinic is different depending on how liked you are by Vicki*"; that when issues are brought to Plaintiff's attention "*she gets defensive and will say not to discuss it again*" and "*there is no follow through and nothing changes*"; and that several staff feared retaliation by Plaintiff for raising concerns. (*Id.*, Ex. 5, LHS000864-865)

  - o Expected performance: demonstrating open communications, developing a plan for coaching staff with HR support, and working closely with HR. (*Id*.)

The PIP required improvement in 30 days or "your employment will be terminated."

(*Id.*) (emphasis added).  Plaintiff denied much of the feedback.  (*Id.*, 64:5-24, 65:2-13, 65:17-20, 66:2-4.)  However, she took action and successfully completed her PIP.  (*Id.*, 66:16-67:2; 72:15-73:6, 74:6-15.)  Plaintiff understood that clearly communicating her schedule was a key to her success.  (*Id.*, 73:23-74:3.)

Plaintiff understood her performance to be strong under her next supervisor, Trish Mason.  (*Id.*, 74:10-12.)  Amidst positive feedback, however, she continued receiving feedback on prior themes: being ***present*** and telling staff when she is out; being ***engaged*** with daily clinic oversight; and ***follow-through***.  (Totten Decl., ¶ 3, Ex. 2, Deposition of Trish Mason (hereinafter "Mason Dep."), 33:7-15, Ex. 38, LHS000314; 34:7-12, Ex. 40, LHS000328-329; 34:17-35:1, Ex. 41, LHS000333-334; Pl. Dep. 178:8-17.)  While Mason worked with Plaintiff on performance over the years, Plaintiff received no corrective action, demotion, or pay decreases. (Pl. Dep. 74:16-75:1, 178:8-17.)

Page 6 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

### C.    Plaintiff's employment in 2022.

In 2022, Plaintiff managed a very busy clinic.  (*Id.*, 137:3-8.)  She estimates approximately 25 employees, included medical providers,[6] front desk ("CSS"),  social worker, triage nurse, medical assistants, revenue cycle specialist, and sometimes a certified medication technician and nurse case manager.  (*Id.*, 12:4-6; Crownhart Dep. 33:16-34:8.)  Plaintiff oversaw and managed the clinic, but not medical providers.[7] (Pl. Dep., 13:8-11, 32:22-33:1, 33:8-14, Ex. 1; Crownhart Decl., ¶ 5.)

In March 2022, Plaintiff began intermittent absences related to a knee condition, and then continuous leave May 4 until mid-August 2022 when she returned after knee surgery.  (Pl. Dep. 76:24-77:9, 81:22-24, 279:11-17.)

### D.    Legacy receives, and follows up on, employee complaints (2022).

As Plaintiff returned to work in August 2022, Mason was leaving the Director position and transitioning responsibilities to Heather Crownhart, who assumed the Director role in September 2022.  (*Id.*, 96:21-23; Crownhart Dep. 12:8-13:1; Mason Dep. 64:17-24.)

Before exiting, Mason heard that Northeast IM Clinic's Medical Director, Steven Seres, M.D., had concerns about Plaintiff's return to the clinic, which she understood to mostly relate to his desire for a less personal, more professional work relationship with Plaintiff.[8]  (Mason Dep. 75:6-10, Ex. 12; Pl. Dep. 96:8-17.)  Dr. Seres also reported concerns about staff turnover due to

---

[6] Besides physicians, this includes advanced practice providers like nurse practitioners. (Crownhart Decl., ¶ 5.)

[7] The social worker, "pharmacy tech" (properly, a Certified Medication Technician), and nurse case manager reported to their own departmental manager as well as dotted line reporting Plaintiff. (*Id.,* Pl. Dep. 13:19-22.)

[8] One of Plaintiff's very first days back, she closed the door to Dr. Seres' office, cried, said that clinic "spies" were watching her, and asked Dr. Seres to tell her if she was a good manager—she was confused when he would not answer. (Pl. Dep. 85:3-24, 86:4-87:7, 91:24-92:7; Seres Dep. 89:7-16, 90:2-8.)  Plaintiff felt her relationship with Dr. Seres changed after she returned from leave, but she does not know why. (Pl. Dep. 186:9-24.)

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

Plaintiff's return.  (Mason Dep. 75:6-10, Ex. 12.)  By mid-September 2022, Plaintiff was informed of the expectation to have *work-focused* conversations with Dr. Seres going forward. (Pl. Dep. 186:25-187:16.)

Dr. Seres took a leave of absence in mid-September.  (Totten Decl., ¶ 6, Ex. 5, Deposition of Steven Seres, M.D. (hereinafter "Seres Dep.") 151:7-10.)  Following his October return, Legacy offered a workplace mediation process for Plaintiff and Dr. Seres to work on their communication.  (Pl. Dep. 187:17-20, 188:6-16; Crownhart Dep. 135:1-8, Ex. 48.)  Despite knowing that Dr. Seres disliked confrontation, Plaintiff directly approached him about the fact they were going to mediation—Dr. Seres again reported concern about Plaintiff crossing boundaries in the workplace.  (Pl. Dep. 91:13-19, 190:9-13; Seres Dep. 186:11-20, Ex. 22.)  As her Director, Crownhart asked Plaintiff for her version of events too.  (Pl. Dep. 190:14-19; Crownhart Decl., ¶ 6.)

As Plaintiff's peer-level employee, Dr. Seres had no managerial or decision-making authority or input for her employment status.  (Seres Dep. 28:8-13; Crownhart Decl., ¶¶ 7-8.)

### 1. Multiple staff report concerns about Plaintiff, and Crownhart investigates.

Crownhart—a brand new Legacy employee—received a *flood of employee complaints about Plaintiff* in October, including but not limited to:

- Dr. Beth Smith, M.D. (interim Medical Director during Dr. Seres' leave) escalated (*Oct. 12*) that an employee's recent exit interview  "*unfortunately aligns with concerns expressed yesterday by staff*," and included points of "*[o]verall concern about leadership*"; that "*[c]oncerns aren't being addressed and are just being dropped even after they have been brought to Vicki's attention*"; that Plaintiff "*is not familiar with the work flow so doesn't pick up*" slack when appropriate; and that Plaintiff made an embarrassing public statement to staff about the exiting employee being unhappy.  (Crownhart Decl., ¶ 10, Ex. 1.)

- Dr. Seres escalated to leadership that an employee came to him in tears, and he asked the employee to instead send concerns about Plaintiff to Crownhart (*Oct.*

Page 8 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

*17*); and that a newer MA, Ms. LaCrosse, approached him with concerns about Plaintiff (*Oct. 21*).  (*Id.* ¶¶ 11-12, Exs. 2-3.)[9]

- **Triage Nurse** Kristy Monroe emailed concerns (*Oct. 28*) that since Plaintiff's return to work "*there has been a great amount of disorganization that is being felt by MAs*," that "*MAs are leaving and/or considering leaving the clinic*," and the "*situation is worsening*."  (*Id.* ¶ 13, Ex. 4.)  Monroe provided specifics, including that new hire MA Sophy Tuy felt she "*made the wrong choice*" by selecting Plaintiff's clinic, that Tuy "*sees how disorganized everything is and how she has no support*" and received "*no formal training*," and that Ms. Tuy planned to transfer to another Legacy clinic once eligible after six months.  Monroe also cited (a) a second employee who had not been trained, (b) a third new employee who lacked necessary onboarding on her first day in October and had "*voiced concern about the disorganization of the clinic and lack of leadership*," (c) an intern MA who stated she would leave Northeast "*as the clinic is too disorganized and lacks leadership*," and (d) a fifth person reportedly struggling with Plaintiff's "*lack of organization and follow through*."  (*Id.*)

- **Licensed Clinical Social Worker** ("LCSW") Rebecca Lebeck raised her own "*concerns regarding my clinic and clinic manager*" (*Oct. 28*). (*Id.* ¶ 14, Ex. 5.) Lebeck reported the below-described incident with Ms. Bray, and also that "*morale has dropped, and it constantly feels like the clinic is in a state of chaos*." (*Id.*)

On October 18, **Certified Medical Technician** ("CMT") Michelle Bray emailed Crownhart.  (*Id.* ¶ 15, Ex. 6.)  The hourly employee explained that she returned from vacation to find hundreds of patient prescription requests awaiting, plus other work.  (*Id.*)  Bray described a lack of support from Plaintiff, and Plaintiff then "embarrassing" her, telling her to do her job in front of multiple coworkers.  (*Id.*)  In deposition, Plaintiff denied both her own responsibility and Bray's characterization of the public incident; given the multiple corroborating reports, Plaintiff admits she does not know what staff believed they heard nor what complaints Crownhart received.  (Pl. Dep. 146:22-147:1, 147:14-148:11.)

---

[9] Dr. Seres was uninvolved in any performance management process for Plaintiff in fall 2022. (Crownhart Decl., ¶ 7; Seres Dep. 28:8-13.)  As Medical Director, it was appropriate for Dr. Seres to escalate staff concerns he received about Plaintiff.  (Pl. Dep. 96:18-20, 182:6-25.)

Page 9 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

Crownhart and Tranby met with Bray on October 19.  (Crownhart Decl., ¶ 16; Tranby Decl., ¶ 8, Ex. 3.)  The employee reported feeling that Plaintiff failed to handle the issue during her vacation, then accused Bray of not doing her job, was rude to her, embarrassed her, and was not supportive or professional. (Tranby Decl., ¶ 8, Ex. 3.)  She reported that three coworkers checked on her after the interaction with Plaintiff.  (*Id.*)  She also explained that while Plaintiff said she could not find help for the work, the Lead MA was "going around sprinkling confetti on desks," but Bray did not feel comfortable raising this issue with Plaintiff due to Plaintiff's perceived close relationship with that employee. (*Id.*)

On October 21, **Nurse Practitioner** Jennifer Parr also reported Plaintiff's conduct, noting that while the CMT was explaining the pending refills and needed help, Plaintiff "*cut her off, and in a pretty brusque tone told her she just needed to get the refills done like she was supposed to,*" which was witnessed by multiple people and "*felt really awkward and inappropriate to discuss*" in public versus behind closed doors.  (Crownhart Decl., ¶ 17, Ex. 7.)  On October 28, **LCSW** Lebeck also reported her concerns, including that Plaintiff confronted the CMT in the pod in front of other staff, after the employee requested help with hundreds of refill requests made while she was out.  (*Id.* ¶ 14, Ex. 5.)

Crownhart met with Plaintiff to learn what occurred.  (*Id.* ¶ 18; Pl. Dep., 150:14-151:9.)  Although Plaintiff testified this meeting is an example of Crownhart "harassing" her, she admitted that it was actually Crownhart's *job responsibility* to follow up on the employee concerns.  (Pl. Dep. 151:13-15, 152:6-21, 164:14-17, 227:1-5.)

While many reported concerns were addressed in Plaintiff's Written Corrective Action, described below, other concerns were raised and did *not* result in corrective action to Plaintiff.  For example, on October 31, Crownhart notified Plaintiff that an unnamed team member had raised a concern regarding a huddle comment about out-of-state patients' video visits, stating that she wanted to hear directly from Plaintiff about what happened.  (*Id.*, 225:16-21; 228:15-22; Crownhart Decl., ¶ 19.)  It was Crownhart's job to follow up upon receiving a concern, and

Page 10 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

Crownhart did the right thing by asking Plaintiff for her side of the story. (Pl. Dep. 164:14-17, 227:1-5, 232:21-233:3.) Then in early November, Crownhart understood that a physician had concerns about the Northeast IM Clinic's workflow, and specifically about Plaintiff's response to the issue; Crownhart followed up, including considering information from Plaintiff. (Crownhart Decl., ¶ 20.) Crownhart did not deliver corrective action to Plaintiff specific to either incident. (*Id.* ¶¶ 19-21.)

### E.    Legacy delivers performance feedback and Written Corrective Action, which Plaintiff disputes.

That fall of 2022, Plaintiff received feedback from Mason and/or Crownhart that staff had reported concerns about Plaintiff, including that: the clinic was ***disorganized***, she was not ***present*** in clinic, she showed ***favoritism*** to the Lead MA, and ***morale*** was lower. (Pl. Dep. 96:24-97:3, 97:11-98:10; 168:15-169:20.) As a new Director over multiple clinics, Crownhart met with Plaintiff regularly, including multiple virtual (Microsoft "Teams") meetings to deliver performance feedback, coaching, and support. (Crownhart Decl., ¶ 22.)

Given the many staff reports about Plaintiff and about staff turnover, Crownhart partnered with Employee Relations Consultant Peter Tranby to deliver corrective action. (*Id.* ¶ 8, 23.) Crownhart prepared a Written Corrective Action ("WCA"), finalizing the document on November 7, 2022. (*Id.* ¶ 23.) That same day, Crownhart and Tranby met with Plaintiff remotely over Teams[10] to deliver the WCA. (Pl. Dep. 197:2-18, Ex. 13; Crownhart Dep. 191:18-191:25, 192:21-193:11.)

The WCA identified performance concerns and detailed Legacy's expectations regarding professional communications, workplace boundaries, clinic operations and organization, receiving feedback, and modeling appropriate behavior for her staff. (Pl. Dep. 197:6-18, Ex. 13.) Citing presence and availability to support staff as "incredibly important," the WCA then

---

[10] Neither Crownhart nor Tranby worked at Plaintiff's site—performance conversations were remote via Teams. (*Id.*, 119:7-12, 197:2-5.)

Page 11 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

identified four specific dates when Plaintiff was absent for full or partial days: September 26 (did not return after PT appointment, despite previously stating she would return);[11] September 28 (called in sick); October 12 (reported late); October 20 (left early without notice). (*Id.*, Ex. 13, LHS000440-441.)

The WCA stated:

> I understand that if I fail to meet the expectations outlined in this memo, further corrective action including the termination of my employment may result.

(*Id.*, LHS000443.)

A month later, on December 6, Plaintiff emailed a rebuttal to Crownhart and Tranby. (Pl. Dep. 198:1-25, Ex. 14.) The written rebuttal did not accept responsibility or indicate interest in improvement. (*Id.*) As to absences, she disputed all four dates. For September 26, she claimed her doctor's office had called her that morning to move the appointment to later, that she notified Crownhart, and that she was at the appointment until nearly 4:30 pm. (*Id.*, Ex. 14, LHS001052-53.) That was flatly false: Plaintiff's medical records reflect that ***her appointment never changed***—it started at 2:15 pm as originally planned, and ended at 3 pm. (Pl. Dep. 254:7-13, 255:5-257:24.) The appointment was just a few miles away, but she did not return to work, and then lied about it in her written rebuttal. (*Id.*, 212:23-213:12.) For the other three dates, her rebuttal repeatedly responded that she ***did not understand what the problem was***. (Pl. Dep. 198:1-25, Ex. 14, LHS001053.) Plaintiff knew that she had no FMLA/OFLA eligibility, and further had no Oregon sick time available.[12]

---

[11] Plaintiff had previously informed Mason of her 2:15 pm appointment and confirmed: "I will come back after this appointment." (*Id.*, 210:25-211:10, Ex. 15, 251:7-24.)

[12] Plaintiff knew that she was not eligible to take additional FMLA/OFLA leave by late September 2022. (*Id.*, 274:6-20.) She exhausted her Oregon Sick Leave allotment in the first half of 2022. (*Id.*, 202:2-18; Tranby Decl., ¶¶ 5-6, Ex. 2, LHS002314, LHS002321.)

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main □ (503) 778-5299 fax

Plaintiff's written rebuttal did not directly address Sections 2 or 3 of the WCA. (*Id.*, Ex. 14.) It did, however, ***dispute and argue against every single bullet point*** in the "Expectations and/or Performance Improvement Plan" section. (*Id.*, Ex. 14, LHS001051-52.) She claimed she had "always" supported her staff, "always" had a professional demeanor at work, "always" been a great leader, and repeatedly stated she had been given "no examples" to the contrary.[13] (*Id.*)

Plaintiff testified that she ***agrees*** with the WCA's points: (a) the "Clinic Manager['s] presence in the clinic is incredibly important"; (b) the Clinic Manager should respect personal and professional boundaries; and (c) success in the areas of "organization and clinic operations" are essential to being a successful Clinic Manager. (Pl. Dep., 197:19-198:9, 198:23-25, Ex. 14, 199:14-22, 200:1-9.) The WCA defined "presence" as "both time in the clinic, but also readiness and availability to support the clinic staff." (*Id.,* Ex. 14, LHS001049.)

### F.    Plaintiff emails a grievance letter.

At the November 7 WCA meeting, Plaintiff stated she was being harassed and told Crownhart and Tranby that she filed a grievance against them both. (Pl. Dep. 191:12-192:2.) According to Plaintiff's deposition testimony, Tranby asked if she thought this was the right time to raise that, grew louder when she would not answer, asked her to read aloud from Legacy's anti-harassment policy and explain if she was referring to harassment defined under the policy (which question she did not answer), and yelled in the meeting. (*Id.*, 191:12-193:9.)

Also on November 7, 2022, Plaintiff emailed a grievance letter to the organization's Interim Director of Human Resources and Chief People and Culture Officer. (*Id.*, 236:12-18, Ex. 18; Totten Decl., ¶ 5, Ex. 4, Deposition of Raelynn Dieter, 36:6-14, Ex. 59.) The letter stated, among other things, that Mason, Tranby, and Crownhart repeatedly held meetings with

---

[13] Plaintiff now admits her rebuttal statement was "false" in stating: "I was being harassed almost daily from my Director and HR"—neither person worked onsite with her, and she did not experience daily harassment from them. (Pl. Dep. 118:22-121:3.) She instead testified to daily onsite "harassment" from Dr. Seres, although Plaintiff also testified that he talked to her infrequently and took a leave of absence that fall. (*Id.*, 20:1-6, 121:4-20.)

Page 13 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

her that "didn't have much substance, but they kept happening," and that she felt retaliated against since returning from medical leave.  (*Id.*)

Following investigation, VP COO Raelynn Dieter sent a closure letter dated December 8, informing Plaintiff that Legacy had investigated and was unable to substantiate the allegations, concluding:

> Our findings are not meant to minimize the impact these performance improvement conversations had on you.  We realize that discussions about performance can be uncomfortable.  However, our practice is to provide staff with clear expectations and support in order to succeed.  We encourage you to communicate openly with your Director about questions you may have related to performance examples that are brought forward.  Additionally, please let me know if I can clarify any expectations or if you need additional support or resources that will help you meet expectations.  Thank you for bringing your concerns forward.

(Pl. Dep. 244:6-25, 246:2-14, 258:22-259:16, Ex. 22.)  After the December 8 letter, Plaintiff did not reach out to engage in such communications, support or resources.  (*Id.*, 258:10-14.)

### G.     Crownhart receives additional staff complaints and appropriately follows up.

Staff complaints did not stop after Plaintiff's WCA.  For example, **CSS** Ms. Blood emailed Crownhart (*Nov. 9*) reporting "grievances" about Plaintiff, stating "I do not feel comfortable speaking to her directly"  (Crownhart Decl., ¶ 24, Ex. 8.)  The CSS wrote that when she previously reported coworker bullying, Plaintiff "*said that is just how they are*"; that Plaintiff did not follow up on other concerns she raised; and "*has yelled at me on multiple occasions in front of other staff members telling me 'get back to work'*" including "*yell[ing] at me from across the room while she was in her office laughing so loud everyone could hear*."  (*Id.*)  The employee also reported that she had previously transferred to a different clinic "*because I felt uncomfortable with things Vicki said and how she made me feel.  On multiple occasions she would say things to me like 'Do you love me' and 'Mama's here for you.'*"  (*Id.*)  The CSS also reported that, when later transferring back to Northeast IM Clinic due to hours and commute, Plaintiff gave the impression that she would receive certain hours but then did not in fact support

Page 14 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

the hours needed and dismissed her concerns.  (*Id.*)  The employee told Crownhart that she was seeking a new job outside of Legacy due to Plaintiff's conduct and Legacy's transfer policy. (*Id.*; Pl. Dep. 107:14-24.)

Crownhart did her job—she followed up on complaints received.  (Pl. Dep. 109:5-110:13, 151:13-15; Crownhart Decl., ¶ 25.)  In a series of "rounding" interviews, Crownhart heard directly from  a front desk employee (***Nov. 9***),[14] triage nurse (***Nov. 9***),[15] and social worker (***Nov. 10***).[16]

Crownhart believed employees were raising truthful concerns.  (Crownhart Decl., ¶ 25, Pl. Dep. 138:11-25, 376:19-377:14.)  Plaintiff also admits at least some reported facts were true. (Pl. Dep. 111:4-15.) For example, in 2022 she still called her staff "my kids," called certain staff "honey," and had a "momager" sign hanging in her office.  (Pl. Dep. 98:23-99:22, 100:12-101:9, 101:22-24, 185:22-186:8.)  For certain reported concerns, even if denying reported conduct, Plaintiff admits they would be problematic *if* true—for example, for daily huddles to feel punitive, or a manager to ask an employee  "do you love me."  (*Id.*, 105:15-17, 106:3-5.)

Still, new staff complaints rolled in.  Later in November:
- **MA** Amanda Dean reported (***Nov. 22***) that the clinic was disorganized and had not had an all-staff meeting for months; that Plaintiff does not communicate effectively, and there is not documented workflow between front desk and MAs; that despite high expectations when joining the clinic, feels "*leadership is*

---

[14] Recorded feedback from Blood including: "*feeling like Vicki is failing as a manager…";* uses morning huddle to call out staff on issues, belittling; calls herself "*momager*" and "*there is no line, tries to be all our friends*".  (Crownhart Decl., ¶ 26, Ex. 9; Pl. Dep. 110:14-21.)

[15] Recorded feedback from Monroe including: that Plaintiff spent significant time in Plaintiff's closed-door office each day, "*leav[ing] the team without an effective lead for long periods of time*"; concerns about disorganized training and onboarding; that "*daily huddles have become punitive in nature*"; and a problematic workflow. (Crownhart Decl., ¶ 27, Ex. 10.)

[16] Recorded feedback from Lebeck including:"[*t*]*hings are chaotic*" in clinic, "[*n*]*o ownership*" or follow through by Plaintiff, the MAs needed "*more leadership support*," Plaintiff called staff "*her kids*" and "*honey*," and that "*a lot of people* [are] *looking for other jobs because they are unhappy.*" (*Id.* ¶ 28, Ex. 11.)

Page 15 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

*lacking*"; that Plaintiff and the Lead MA have multiple lengthy daily meetings with laughing heard from Plaintiff's office; that an extern worked unsupervised; that the Lead MA worked well when the interim clinic manager was in place but with Plaintiff in charge, the Lead MA was instead on her phone, not working, and spending substantial time in Plaintiff's office; a lack of organization for MA schedules and lack of training; and that despite the busy clinic, Plaintiff nonetheless went around the office showing personal pictures on her phone. (Crownhart Decl., ¶ 29, Ex. 12.)

- Dr. Seres reported (*Nov. 29*) that **MA** Tuy and **Triage Nurse** Monroe each came to his office yesterday upset about interactions with Plaintiff. (*Id*. ¶ 30, Ex. 13.)

  o Crownhart responsibly followed up (*Nov. 30*) and understood the **Triage Nurse**'s main concern to be *boundaries*—expressing concern about a closed-door meeting where she felt Plaintiff made inappropriate and uncomfortable comments, but she also felt unable to leave due to power discrepancy, and not being comfortable talking directly to Plaintiff. (*Id*.; Pl. Dep. 167:16-24.)

  o **MA** Tuy, who Plaintiff hired in September 2022, reported to Crownhart (*Dec. 6*) that staff were leaving due to management; she did not feel properly onboarded; the clinic felt "*dysfunctional*" and lacking a daily plan; clinic communication was unorganized; not feeling supported by leader due to lack of professionalism, citing examples; and the Clinic Manager lacks professionalism and clear communication. (Crownhart Decl., ¶ 31, Ex. 14; Pl. Dep. 123:23-124:2, 127:23-128:22.)

- The **Triage Nurse** again expressed concern (*Dec. 7*) about a December 1 meeting in which, to Crownhart's understanding, the nurse felt Plaintiff inappropriately included her in a conversation about another employee's job performance. (Crownhart Decl., ¶ 32, Ex. 15.) Crownhart understood the nurse was now looking for job opportunities at other Legacy clinics. (*Id.*)

Regardless of whether Plaintiff disagrees with the merits of any particular reported concern, she agrees that multiple items reported *after* her WCA—for example, having a documented and known workflow between the front desk and MAs, communicating a daily clinic plan, and complying with meal break regulations—were her overall responsibility and would be problematic if missing in her clinic. (Pl. Dep. 126:2-11, 127:23-128:22, 129:12-17, 132:1-11, 133:9-16.)

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

Following the WCA, Plaintiff also had further unplanned absences.  (*Id.,* 266:9-17, Ex. 23; 267:11-268:18; Tranby Decl., ¶ 10, Ex. 4.)  Plaintiff admits: such unplanned absences were not protected leave and count against employee attendance records, managers are not immune to performance repercussions, and it is appropriate to be written up for the same.  (Pl. Dep. 270:20-271:12; 272:22-273:5.)

### H.    Staff continue reporting concerns, and Plaintiff receives a Final Corrective Action removing her from people management and giving an option to avoid termination, and she chooses employment outside Legacy.

Plaintiff was seeking a new job outside of Legacy as early as November 2022.  (*Id.*, 264:2-25; 352:13-353:4.)  Meanwhile however, Plaintiff's Director continued meeting with her for post-WCA follow-up and to provide feedback.  (Crownhart Decl., ¶ 33.)  For example, on December 13, 2022, Crownhart and Tranby met with Plaintiff for a scheduled one-month Corrective Action Follow Up meeting.  (*Id.*)  However, on **December 16,** Plaintiff was absent again.  (Pl. Dep. 266:9-17, Ex. 23; Tranby Decl., ¶ 10, Ex. 4, LHS00668.)  On **December 23**, Dr. Seres reported that an MA contacted him that day, while he was on vacation, and he understood she was essentially quitting because of a purported "embarrassing public interaction" with Plaintiff.  (Crownhart Decl., ¶ 34, Ex. 16.)  Also on **December 23**, LCSW Lebeck contacted Crownhart, reporting Plaintiff's conduct with an MA during daily huddle on December 22.  (*Id.* ¶ 35, Ex. 17.)  Crownhart documented her understanding from the LCSW, included her observation that when Plaintiff was in the clinic, her door was closed and she was not engaged.  (*Id.*)  When Crownhart asked about clinic communications—a theme from November rounding—the employee reported that communication remained very unclear.  (*Id.*)

### 1.    Plaintiff receives a Final Corrective Action with 30 days to find a non-managerial position, in lieu of termination.

On December 28, 2022, Crownhart and Tranby met with Plaintiff via Teams to deliver a Final Corrective Action ("FCA").  (Pl. Dep. 259:17-24, 262:5-263:10.)  The FCA described new incidents of concern arising *after* the WCA.  (*Id.*, 266:9-17, Ex. 23.)

Page 17 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

As to attendance, the FCA cited six unplanned absences from November 8 through December 16, plus four instances of leaving early in the past 30 days.  (*Id.*, Ex. 23, LHS000437.) Plaintiff was absent despite knowing that staff had expressed concern she was not present and despite hearing from Crownhart that lack of clinic presence was a performance concern.  (Pl. Dep. 269:16-270:18.)  Plaintiff disagreed with the expectation, but she did know the expectation—Crownhart had told Plaintiff that "I needed to be in the clinic, yes."  (*Id.*, 267:11-268:18, 269:4-270:18.)[17]

As to professionalism and leadership, the FCA cited themes from post-WCA rounding interviews and conversations with staff: a need for support of onboarding and training for new staff; organization for clinic operations (including clear break schedules, training plans, and clinic protocols); the need for Plaintiff's presence and readiness to lead; and respect for personal boundaries.  (*Id.*, 266:9-17, Ex. 23.)

Finally, the FCA cited Plaintiff's "*leadership role in the clinic which holds a high level of responsibility to adhere to Legacy policies regarding behavior,*" and concluded that Plaintiff could no longer work as a Legacy Clinic Manager.  (*Id.*, Ex. 23, LHS000439.)  Instead, Legacy provided Plaintiff with 30 days to find a new non-supervisory/non-managerial position within Legacy.  (*Id.*)  During that window, Legacy would further pay 10 additional days' salary despite no work performed, and Plaintiff would also receive full benefits for the entire period—after the 30-day period, her employment would end if she had not secured a new position.  (*Id.*)

### 2.  Plaintiff chooses not to seek a Legacy position and accepts employment elsewhere before the 30-day period expires.

Plaintiff performed no work after December 28, 2022.  (Pl. Dep. 279:18-21; 284:6-11.) She neither applied nor even looked for any position at Legacy.  (*Id.*, 286:10-287:11.)  Legacy offers salaried exempt positions that do not involve supervising or managing people, including

---

[17] Again, these were not Oregon Sick Leave, FMLA or OFLA absences.  (Pl. Dep. 270:20-273:5, 273:20-274:20; *supra* p. 12, n. 12.)

Page 18 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

program managers and positions in its System Office. (Tranby Decl., ¶ 11.) However, Plaintiff did not search or apply for *any* such administrative positions, and did not want to work for Legacy. (Pl. Dep. 287:2-11.)

Legacy paid Plaintiff 10 days' salary, without work performed, though not required to do so. (*Id.*, 276:12-15, 283:25-284:5; Tranby Decl., ¶ 12.)

Plaintiff received a January 13, 2023, offer letter for a full-time position as Operations Manager for a different health care employer, with an anticipated start date of January 23, 2023. (Pl. Dep. 305:5-12, 305:21-306:4, Ex. 28.) She did not inform Legacy of her new employment during the 30-day window. (*Id.*, 287:12-17, Ex. 25; Crownhart Decl., ¶ 36.) Regardless, Legacy did not terminate Plaintiff's employment on the 31st day after the December 28 FCA. She remained employed. (Crownhart Decl., ¶ 36.) On Thursday, February 2, 2023, Plaintiff finally emailed Legacy: "I have found employment outside of Legacy." (Pl. Dep., 287:12-17, Ex. 25.) Crownhart responded that Legacy had reached out to discuss next steps but, given Plaintiff's job announcement, "we will assume that you are not applying for any positions within Legacy, and we don't see any active applications in the Legacy system." (*Id.*) Accordingly, Crownhart informed her that employment would end that day with employee benefits continuing through February 2023. (*Id.*)

### III.  LEGAL STANDARD

Fed. R. Civ. P. 56(a) entitles a party to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine "only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001).

To survive summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts" and "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis omitted). Namely, a plaintiff must present

Page 19 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

specific "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[F]ailure to allege 'specific facts' sufficient to establish the existence of a prima facie case renders a grant of summary judgment appropriate." *Yartzoff v. Thomas*, 809 F.2d 1371, 1374 (9th Cir. 1987) (citing *Palmer v. United States*, 794 F.2d 534, 536-39 (9th Cir. 1986)).

For Plaintiff's Third through Ninth Claims for Relief, "the mere existence of a *prima facie* case…does not preclude summary judgment." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994). These claims require the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973): "Once a *prima facie* case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory [or retaliatory] reasons." *Wallis,* 26 F.3d at 889. If "the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision," the plaintiff must prove that the articulated reason is pretextual or else summary judgment is proper. *Id*.

## IV.  ARGUMENT

Plaintiff's nine claims overlap, such that a single finding may dispose of multiple claims. For example, determining that Legacy had legitimate, non-discriminatory, non-retaliatory, and non-pretextual reasons for the Final Corrective Action (FCA) would mandate dismissal of Plaintiff's Fourth through Ninth Claims. Finding that the FCA was not caused by Plaintiff's use of FMLA/OFLA leave months prior would require dismissal of Plaintiff's First, Second, and Fifth Claims. Additional and alternative independent grounds also follow.

### A.    Plaintiff's FMLA and OFLA Interference Claims Fail as a Matter of Law (First and Second Claims).

Plaintiff's first two claims allege Legacy interfered with her OFLA and FMLA rights at the end of her employment by: removing her from her Clinic Manager position on December 28, 2022 (more than four months after return from leave), providing (only) ten days of additional pay

Page 20 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

after her removal, and separating her employment on February 2, 2023 (collectively "the FCA Actions"). *See* Compl., at ¶¶ 40-43, 48-51.[18]  Both claims fail because Plaintiff lacks specific facts establishing a genuine dispute of material fact.

FMLA and OFLA interference claims share the same elements. *Johnson v. Jondy Chems., Inc.*, 2017 WL 1371271, at *4 (D. Or. Apr. 13, 2017).  Plaintiff must prove that (1) she exercised her FMLA/OFLA rights, (2) her employer engaged in activity tending to chill the exercise of rights, and (3) the employer's activity was motivated by such exercise. *Gustafson v. U.S. Dep't of Energy*, 2023 WL 3688077, at *4 (D. Or. Mar. 13, 2023).  Plaintiff lacks facts supporting a causal link between her protected leave and the FCA Actions.

### 1.    Temporal proximity alone cannot establish causation.

Plaintiff relies on the timing between her May-August medical leave and the end of her employment.  Unlike for many legal claims, "temporal proximity alone…has been held inadequate to establish causation in FLMA [sic] interference cases to which *McDonnell Douglas* burden-shifting does not apply." *Carter v. Fred Meyer Jewelers, Inc.*, 2019 WL 2744190, at *4 (D. Or. Apr. 10, 2019); *see also Rieman v. Evraz Inc., NA*, 2019 WL 13241465, at *3 (D. Or. June 25, 2019) (granting summary judgment on OFLA interference where terminated for excessive unprotected absences three months after medical leave); *Mathieson v. Yellow Book Sales & Distrib. Co., Inc.*, 2008 WL 2889398, at *7 (D. Or. July 21, 2008) (granting summary judgment on FMLA/OFLA claims where the only causation evidence was timing, with termination one week before scheduled return from leave); *Jacobson v. Carlton Hair*, 2011 WL 13112239, at *31 (C.D. Cal. Jan. 31, 2011) (temporal proximity alone cannot establish causation for FMLA interference claims); *Zsenyuk v. City of Carson*, 99 F. App'x 794, 796 (affirming summary judgment because temporal proximity was insufficient to create a genuine issue of

---

[18] Though Plaintiff's First and Second Claims expressly rest on the FCA Actions as adverse actions, even basing her Claims on other adverse actions would also fail for the reasons stated *infra* for other alleged actions.

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

causation). Instead, "[t]emporal proximity must be accompanied by direct or circumstantial evidence that FMLA leave was considered as a factor in termination." *Carter*, 2019 WL 2744190, at \*4 (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001)). Because Plaintiff cannot meet this burden, summary judgment is proper.

### 2.    Intervening events break any causation inference.

Even where circumstantial evidence exists, summary judgment is appropriate upon evidence of "intervening event[s] of such great import that no reasonable jury could conclude that" that the earlier protected activity "was a substantial factor in the motivation" of an adverse action. *See Howard v. Milwaukie Convalescent Hosp., Inc.*, 2008 WL 4117167, at \*8 (D. Or. Aug. 25, 2008) (granting summary judgment on a wrongful discharge claim, where plaintiff was terminated after mishandling patient records three weeks after protected activity).

Plaintiff returned to her position after FMLA/OFLA leave. She then got a new supervisor, who received concerns from *many* staff. Crownhart investigated, provided corrective action with written expectations, and received still more concerns. *Supra,* Sec. II.D-E, II.G. After notice to Plaintiff, and more staff reports of similar or related conduct, Legacy removed Plaintiff as Manager. Supra, Sec. II.G-H. Any timing-based inference that Plaintiff may otherwise seek to draw between her leave and eventual FCA Actions fails because these intervening events break any inference of a causal chain that timing could otherwise support. *See, e.g.*, *Curley v. City of North Las Vegas*, 772 F.3d 629, 633-34 (9th Cir. 2014) (affirming summary judgment on ADA retaliation claim because plaintiff's altercation with coworker defeated causal link between earlier protected activity and termination); *Mathieson*, 2008 WL 2889398, at \*7 (timing of termination was "insufficient to defeat summary judgment" on OFLA retaliation claim where plaintiff engaged in activity that was "a clearly-stated cause for termination").

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

**B.    Plaintiff's Hostile Work Environment Claim Fails as a Matter of Law (Third Claim).**

Plaintiff's Third Claim alleges hostile work environment based on disability.  First, we find no Oregon state or federal court permitting an ORS 659A.112 claim to proceed on a disability-based hostile work environment theory.[19]  The Court may deny her claim on this basis alone.

Even if this Court recognizes the novel claim, Plaintiff's claim fails because she cannot establish her prima facie case.  To do so, Plaintiff must present evidence of harassment because of disability, "and that the harassing conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment."  *See Mattioda v. Nelson*, 98 F.4th 1164, 1174 (9th Cir. 2024) (citing the ADA/Rehabilitation Act standard); *see also Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (citing the Title VII and 42 U.S.C. § 1981 standard).  Plaintiff has no such evidence.

### 1.    Plaintiff lacks evidence of harassment because of disability.

Plaintiff's theory appears based on receiving performance coaching and corrective action, and perceiving that relationships with certain coworkers changed after her return from leave. Plaintiff's testimony is insufficient to show a causal link between the allegedly adverse actions and her alleged disability.  *First,* a plaintiff cannot establish harassment based on *disability* with evidence that relationships changed *after her medical leave,* where her disability was known *before* her leave.  *See Jackson v. City of Yachats*, 2025 WL 3524372, at \*17 (D. Or. Dec. 9, 2025) (granting summary judgment on ORS 659A.112 discrimination claim).  Plaintiff testified that things changed only after her leave for surgery to address the condition.  *Second and dispositively*, she lacks evidence of disability-related comments made to her.  She relies on

---

[19] Although courts have allowed hostile work environment claims under the analogous federal law, 42 U.S.C. § 12112, Plaintiff has not brought that claim.

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main □ (503) 778-5299 fax

speculation.  Because Plaintiff lacks evidence of conduct related to her claimed knee disability, her claim fails.

### a.  Legacy's performance improvement efforts did not create a disability-based hostile work environment.

Plaintiff alleges harassment by Crownhart and Tranby, but cannot establish evidence that alleged treatment related to her disability. Specifically, Plaintiff claims that she had multiple performance meetings with Tranby and Crownhart, who critiqued her performance including via written corrective action, that Tranby yelled at her in meetings, and that she felt her perspective was not considered.  Plaintiff admits, however, that it was Crownhart's job responsibility to follow up on employee concerns.  (Pl. Dep. 151:13-15, 164:14-17, 227:1-5.)  Further, Plaintiff claims that Tranby's "yelling" was in relation to her "filing a grievance"—not her disability.  (Pl. Dep. 194:4-21.) There is no evidence related to disability.

### b.  Changes in workplace relationships are insufficient.

Nor do Plaintiff's perceptions that relationships changed after her leave establish a hostile work environment or bear relationship to her alleged disability.  Specifically, Plaintiff alleges that her relationships with Tranby, Crownhart, Dr. Seres, and others changed after her leave, but that she has no explanation for *why* these relationships changed except that she felt "[t]hey didn't treat me badly before I left."  (Pl. Dep. 84:11-16; 282:10-283:18.)

*First*, speculation regarding others' motives does "not create a factual dispute for purposes of summary judgment."  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

*Second*, timing in relation to Plaintiff's *leave* does not tie perceived relationship changes to Plaintiff's *disability*.  *See Supra*, Sec. IV.B.1.

*Third*, her theory that individuals treated her well after knowledge of a claimed known disability (knee condition) (*through May 2022)* and differently after knee surgery (*after mid-August* 2022), only contradicts Plaintiff's argument that alleged harassment was disability-based.

Page 24 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

*See Jackson*, 2025 WL 3524372, at *18 (plaintiff failed to establish causation where the adverse action occurred after the leave, but did not occur between awareness of the disability and the leave).  Of note, Plaintiff had no prior relationship with Crownhart.

Without evidence that any perceived conduct was ***because of*** disability, Plaintiff's claim fails.

### 2.    Plaintiff cannot meet the "severe and pervasive" standard.

Plaintiff's hostile work environment claim fails for another independent reason: the alleged conduct was not severe or pervasive enough to materially alter the terms of her employment or to create an abusive environment as a matter of law.  *See Mattioda*, 98 F.4th at 1176 ("The conduct must be both subjectively and objectively abusive.").

***First***, increased supervision and performance management to improve an employee's performance do not alter the terms of employment and therefore do not support this claim. *Sheridan v. Providence Health & Servs.-Oregon*, 2011 WL 13250762, at *14 (Sep. 6, 2011) (granting summary judgment), *adopted by* 2011 WL 6887160 (D. Or. Dec. 29, 2011).  "[W]hile a person in [Plaintiff]'s position might have felt considerable pressure to demonstrate improved performance," these measures did not subject her "to objectively offensive conduct creating a hostile work environment."  *See id*.

***Relatedly,*** nor does what Plaintiff perceived as rude communication plus her testimony of Tranby "yelling" at her support herclaim.  *See, e.g., Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003) (incidents of yelling, even combined with racially charged comments and false complaints about the plaintiff, did not support a hostile work environment claim); *Johnson v. Chevron Corp.*, 2009 WL 1404699, at *13 (N.D. Cal. May 19, 2009) (yelling that made plaintiff cry were "isolated instances of hostility"); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (isolated incidents insufficient unless extreme).

***Similarly***, Dr. Seres' request that Plaintiff limit communications to work-related topics, and perceived changes in her relationships with others, are insufficient.  Social snubbing,

Page 25 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

ostracism, and even the "silent treatment" are not sufficient to sustain a hostile work environment claim in this district. *See Kim v. Prudential Fin., Inc.*, 2016 WL 2595477, at *4 (D. Or. May 4, 2016). Legacy "had no duty to prevent workplace rudeness or to make sure all their workers got along well together in the workplace." *Jernigan v. Alderwoods Grp., Inc.*, 489 F. Supp. 2d 1180, 1202 (D. Or. 2007); *see also Faragher*, 524 U.S. at 788 (hostile work environment claims should not be used to impose a general civility code). Without evidence of "severe and pervasive" harassment related to disability, summary judgment is appropriate.

### C.   Plaintiff's Disability Discrimination Claim Lacks Merit (Fourth Claim).

Plaintiff's fourth claim (ORS 659A.112) relies on the FCA Actions: removal as manager, partial paid leave, and employment separation. Compl. ¶¶ 62, 65. Her disability discrimination claim requires evidence that (1) she is a qualified individual with a disability, (2) she suffered an adverse employment action, and (3) there was a causal relationship between the adverse employment action and her disability. Only upon establishing this prima facie case would the burden shift to Legacy to identify a "legitimate, nondiscriminatory" reason for the FCA Actions. *See Kelly v. Boeing Co.*, 400 F. Supp. 3d 1093, 1107 (D. Or. Aug. 15, 2019).

Because Plaintiff cannot establish a prima facie case and will be unable to show that Legacy's legitimate nondiscriminatory reasons for its actions were pretextual, her claim fails.

#### 1.   Plaintiff must establish that she was a qualified person with a disability.

Plaintiff's prima facie case requires her to prove a disability existed in the relevant time period. *See Lyzer v. Caruso Produce, Inc.*, 2019 WL 7206449, at *3 (D. Or. Sep. 9, 2019), *adopted in relevant part by* 2019 WL 5960655 (Nov. 13, 2019). Without evidence she was a qualified employee with a disability at the relevant time, her claim fails.

#### 2.   Plaintiff lacks evidence indicating alleged adverse acts because of a disability.

Plaintiff cannot satisfy the third prong of a causal link between an earlier disability and the later FCA Actions. As established *supra*, Plaintiff cannot show causation through temporal

Page 26 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

proximity because "Defendant was aware of the disability for months before" the alleged adverse action, and *intervening events* occurred.  *See Jackson*, 2025 WL 3524372, at *18.  Plaintiff must bring forward *specific facts* demonstrating causation. Because she has none, her claim fails.

### 3.    Plaintiff was removed from management for legitimate, nondiscriminatory reasons.

Even if Plaintiff could establish a prima facie case, Legacy offers evidence of its legitimate, nondiscriminatory reasons for the FCA Actions.  In the fall of 2022, Legacy received an avalanche of staff complaints from numerous employees.  Crownhart followed up and believed the complaints were in good faith and  reflected serious issues.  (Pl. Dep. 111:4-15, 138:11-25, 376:19-377:14; Crownhart Decl., ¶ 25.)  Plaintiff may dispute the underlying events with her own explanations, but she cannot dispute what Legacy heard and understood to be voluminous and credible staff concerns about her leadership.

Legacy took multiple steps to work with Plaintiff in response to staff feedback.  As her new Director, Crownhart met with Plaintiff to discuss performance.  She issued the November 7 WCA expressing expectations.  Plaintiff responded with a written rebuttal challenging every single one.[20]  Plaintiff's clinic presence did not improve.[21]  And Legacy received *more, new* staff complaints.

Legacy determined that Plaintiff was still not meeting its expectations for Clinic Manager and, accordingly, removed her from management and offered 30 days to find a non-managerial position within Legacy, which she did not even attempt to do.  Because Plaintiff cannot create a

---

[20] Notably, "[a]n employee's "subjective personal judgments of her competence alone do not raise a genuine issue of material fact."  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *see also Buhagiar v. Wells Fargo Bank, N.A.*, 2024 WL 2931427, at *2 (9th Cir. June 11, 2024) (terminated employee's "belief that she was performing well is not sufficient to create a genuine dispute of material fact" where manager had documented subpar performance.)

[21] Poor attendance is a legitimate, nondiscriminatory, self-sufficient reason for adverse employment actions.  *See, e.g., Tchir v. Unified W. Grocers Inc.*, 135 F. App'x 39, 41 (9th Cir. 2005) (violating attendance policy is "a legitimate, nondiscriminatory reason for…termination").

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
(503) 241-2300 main ☐ (503) 778-5299 fax

question of material fact that Legacy's reasons for these actions were pretextual, and intervening events cut off any causal inference, summary judgment is proper.

### D.      Plaintiff's Retaliation Claims Fail as a Matter of Law (Fifth through Ninth Claims).

Plaintiff's remaining five claims allege retaliation under ORS 659A.109 (Seeking Accommodation), ORS 659A.199 (Whistleblower), ORS 653.641 (Oregon Sick Leave Act ("OSLA")), and ORS 659A.030(1)(f) (Opposing Unlawful Employment Practices) (two counts).[22] The same basic prima facie elements apply: Plaintiff must show (1) she engaged in a protected activity, (2) an adverse employment action,[23] and (3) a causal link between the two. *See Lyzer*, 2019 WL 7206449, at *8. If Plaintiff establishes a prima facie case of retaliation, the burden shifts to Legacy to articulate a legitimate, nonretaliatory reason for the adverse action. *See Tchir*, 135 F. App'x at 41. Summary judgment is proper unless Plaintiff establishes pretext. *Id.* at 42.

### 1.      No adverse action sufficiently supports Plaintiff's "pre-termination retaliation" claim (Eighth Claim).

Plaintiff's Eighth Claim theorizes that she engaged in protected conduct by allegedly objecting to criticism by Crownhart and Tranby in performance meetings in September-December 2022, informing them she would file a grievance and then doing so, and rebutting her WCA. *See* Compl., ¶ 84. Plaintiff's alleged adverse actions are (a) verbal badgering and

---

[22] ORS 659A.030(1)(f) was renumbered, without textual revision, to ORS 659A.030(1)(g). *See* 2025 Or. HB 3187. This Motion uses the statutory citation applicable when Plaintiff filed her action.

[23] The standard for adverse actions under ORS 659A.109 and 659A.199 is higher than for ORS 659A.030 claims. While the latter covers activity that might dissuade a reasonable worker from pursuing their rights, the ORS 659A.199 "statute covers only a subset of that conduct; specifically, it covers conduct that related to the terms, conditions, or privileges of employment." *Summerfield v. Or. Liquor Comm'n*, 366 Or. 763, 782-83 (2020) (internal citations omitted); *see also Mejia v. Lamb Weston, Inc.*, 2020 WL 363387, at *3, 5-6 (D. Or. Jan. 22, 2020) (applying lower standard to ORS 659A.109 claim).

Page 28 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

criticism in November 7 and December 13 meetings; (b) the WCA; and (c) the rejection of her grievance. *Id.*, ¶ 85. Again lacking a reasonable inference of causation, her claim fails.

### a.    Only legally protected activity is relevant.

As a threshold matter, defending oneself against work-related criticism is not protected activity. *See* ORS 659A.030(1)(f) (limiting protection to opposing an unlawful practice, filing a complaint, assisting in a proceeding, or attempting to do so); *Arigbon v. Mult. Cnty.*, 2010 WL 2038839, at *18 (D. Or. May 20, 2010) (opposing comments about performance issues and writing rebuttal to performance evaluation were not protected activity because they, "[a]t most," conveyed that the employee felt her supervisor "had treated her unfairly"). Instead, for an objection to constitute protected activity, it must actually convey opposition to unlawful employment practices. *See Sereno-Morales v. Cascade Food, Inc.*, 819 F. Supp. 2d 1148, 1153 (D. Or. May 12, 2011) ("In the Ninth Circuit, an employee's statement does not constitute protected activity, unless it refers to some practice by the employer that is allegedly unlawful.") (internal citations omitted); *Pool v. Vanrheen*, 297 F.3d 899, 911 (9th Cir. 2002) (letter was not protected activity because its allegations of a "good ole boy network" did not specifically allege unlawful discrimination). Plaintiff's rebuttal to performance criticism is not legally protected. *See e.g.* (Pl. Dep. _, Ex. 14).

With respect to the November 7 meeting, Plaintiff relies on her testimony that Tranby "yelled" after she mentioned a grievance. However, she further testified that, when yelling, he asked her to read Legacy's anti-harassment policy, she saw it related to protected class discrimination, and he asked "do you feel like you've been harassed because of that. And he goes, is anything that you're saying right now part of what you just read." (Pl. Dep. 192:12-193:2.) Plaintiff did not answer his first question and cannot recall answering his second. (Pl. Dep. 193:3-9.) Thus, Plaintiff did not engage in protected activity during that meeting—she specifically did ***not*** claim harassment or retaliation based on protected status.

Page 29 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

Finally, Plaintiff relies on her written grievance, which referred to retaliation and harassment based on medical leave. (Pl. Dep. 236:12-18, Ex. 18.) Legacy agrees the letter constitutes protected activity, but only as relevant to those individuals who knew of its contents.

### b.    Plaintiff cannot establish an actionable adverse action.

*First*, it is axiomatic that an actor must *know of* protected activity in order to possibly retaliate *based on* such activity. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). Thus, Plaintiff cannot establish that any conduct *before* her written grievance could be retaliation for it. Nor can she establish that any subsequent conduct is because of her grievance without evidence that the alleged wrongdoer knew of such activity.

*Second,* the WCA (even if serving as adverse action on certain claims)[24] cannot be retaliation for Plaintiff's statements during the November 7 meeting nor the November 7 grievance she filed with upper management, because Legacy indisputably prepared the WCA *beforehand*. *Supra*, Sec. II.E. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned" corrective action upon learning of protected activity, "and their proceeding along lines previously contemplated…is of no evidence whatever of causality.").

*Third*, Plaintiff lacks any evidence that senior-level leadership's determination that her grievance was unsubstantiated was because of legally protected activity.[25]

---

[24] For purposes of at least ORS 659A.109 and 659A.199 claims, performance improvement efforts are not adverse employment action unless materially affecting compensation, terms, conditions, or privileges of employment, which Plaintiff's WCA did not do. *See Jackson*, 2025 WL 3524372, at *17 (citing *James v. C-Tran*, 130 F. App'x 156, 157 (9th Cir. 2005)).

[25] Even if Legacy had failed to investigate her grievance, "the failure to conduct an adequate investigation after an alleged act of discrimination . . . cannot be considered an action that reasonably would deter an employee from engaging in the protected activity." *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1061 (N.D. Cal. Apr. 18, 2011).

Page 30 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

*Finally,* Plaintiff's remaining allegedly adverse actions, being "harangued" and "criticized" in November 7 and December 13 performance meetings are not adverse actions. "[M]aking negative or offensive comments . . . or bad-mouthing an employee is not an adverse action." *Herman v. Port of Astoria*, 2015 WL 7720500, at *3 (D. Or. Nov. 28, 2015) (denying motion to amend complaint to add ORS 659A.030(1)(f) and 659A.199 claims); *see also Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (being "bad-mouthed and verbally threatened" is not an adverse employment action for a First Amendment retaliation claim).

Of all the allegedly adverse employment actions on which Plaintiff predicates her eighth claim, none survive.

### 2. Plaintiff cannot meet the third element of causation on any of her remaining retaliation claims.

Plaintiff's remaining retaliation claims fail because she cannot establish the requisite causation. To do so, she must show that her protected activity was "a substantial motivating factor in the adverse employment decision, and that 'but for' his protected activity, the adverse action would not have been taken." *Biggs v. City of St. Paul*, 2019 WL 4575839, at *12 (D. Or. Mar. 7, 2019).

### a. Plaintiff was not retaliated against for taking FMLA/OFLA leave (Fifth Claim).

Plaintiff's Fifth Claim (ORS 659A.109) asserts that the FCA Actions were retaliation for exercising her right to FMLA/OFLA leave. As established *supra*, Section IV.A., she lacks evidence that Legacy acted because of her medical leave. Instead, any plausible timing-based inference is foreclosed by intervening events of employee complaints and concerns about staff turnover. *See Kama v. Mayorkas*, 107 F.4th 1054, 1062 (9th Cir. 2024) (employee's noncooperation in an investigation broke causal chain between complaint and termination). Thus, her claim fails.

### b. Plaintiff was not retaliated against for taking protected sick leave (Seventh Claim).

Page 31 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

The same is true for Plaintiff's Seventh Claim (ORS 653.641), asserting that the FCA Actions were because she took Oregon Sick Leave ("OSL"). OSLA provides up to 40 hours of sick time per year; any additional time an employer voluntarily offers is *not* protected. ORS 653.606(3)(b). Under Legacy's policy, OSL use runs concurrently with FMLA/OFLA. (Tranby Decl., ¶¶ 5-6, Ex. 2.) Thus, her OSL must have exhausted *at the latest* after 40 hours of FMLA/OFLA, which she took intermittently in March 2022 and continuously starting May 4, 2022. (*Id.*) Plaintiff did not take any protected sick leave in the fall of 2022 because she had none available. The temporal gap is even greater than other claims, and further, the same intervening events apply here to defeat the claim.

### c.       The FCA Actions were not whistleblower retaliation (Sixth, Ninth Claims).

Plaintiff's Sixth and Ninth Claims allege the FCA Actions were taken because she opposed or reported an unlawful practice, in violation of ORS 659A.199 and ORS 659A.030(1)(f), by filing her grievance. There is again no question of disputed material fact.

***First***, Plaintiff must establish that an FCA Actions decisionmaker had knowledge of protected activity in the grievance. *Supra,* Section IV.D.1.b.

***Second,*** as above, Plaintiff lacks direct evidence supporting causation and relies upon purported temporal proximity, which is insufficient. As discussed *supra*, where Legacy received subsequent staff complaints regarding Plaintiff, those ***intervening events*** break any chain of causal inference that could otherwise be created by timing alone. *See Kama*, 107 F.4th at 1062 ("When there are equally likely causes of Plaintiff's termination that arise during the same period, temporal proximity does not establish that unlawful discrimination more likely than not motivated the employer.") (internal citations omitted); *Cummings v. Valley Health Sys., LLC*, 705 F. App'x 529, 532 (9th Cir. 2017) ("[N]ew intervening discovery undermines the causal inference.").

Page 32 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

*Further*, where, as here, the allegedly retaliatory conduct results from a process that began before protected activity, timing alone does not create an inference of causation. *See Powell v. Noem*, 2025 WL 2814698, at \*1 (9th Cir. Oct. 3, 2025) (affirming summary judgment because timing between grievance and notice of proposed termination did "not raise a genuine issue of material fact" where the grievance was preceded by a report of misconduct and ongoing investigation). Plaintiff cannot rely on the timing alone between emailing her grievance and the FCA Actions, because that theory ignores the ongoing performance process, including a WCA, before the grievance. Her pre-grievance WCA outlined expectations and stated: "*I understand that if I fail to meet the expectations outlined in this memo, further corrective action including the termination of my employment may result*." Legacy then received *more* employee complaints and information that Plaintiff continued not meeting WCA expectations. Legacy subsequently removed her from management. Without temporal proximity, Plaintiff lacks specific facts demonstrating a material dispute on causation, and her whistleblower claims fail.

### 3. Legacy's legitimate reasons for the FCA Actions require Plaintiff to establish pretext.

Given Legacy's substantial evidence of its legitimate, nonretaliatory reasons for the FCA Actions, Plaintiff must offer specific facts supporting pretext. Because she cannot do so based on the record taken in the light most favorable to Plaintiff, her retaliation claims fail.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant Legacy's motion for summary judgment.

Page 33 – DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT

DATED this 23rd day of January, 2026.

**DAVIS WRIGHT TREMAINE LLP**


By _s/ Christie S. Totten_
        Christie S. Totten, OSB #085890
        christietotten@dwt.com
        Jandee Wallis, OSB #244454
        jandeewallis@dwt.com
        Telephone: (503) 241-2300
        Facsimile: (503) 778-5299

        Attorneys for Defendant


This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains (10,798) words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main □ (503) 778-5299 fax