IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VICKI HEISEN, an individual,

        Plaintiff,

    v.

LEGACY HEALTH, an Oregon non-profit corporation,

        Defendant.

Case No. 3:25-cv-00197-AB

OPINION & ORDER

Brian Donald Potter
Brian Donald Potter, Attorney at Law
3236 S.W. Kelly Avenue Suite 101
Portland, OR 97239

      Attorney for Plaintiff

Christie S. Totten
Jandee Wallis
Davis Wright Tremaine, LLP
560 SW 10th Avenue Suite 700
Portland, OR 97205

      Attorneys for Defendant

1 – OPINION & ORDER

**BAGGIO, District Judge:**

Plaintiff Vicki Heisen brings this case against Defendant Legacy Health. Plaintiff asserts four claims for relief: interference under the Oregon Family Leave Act ("OFLA"); interference under the Family Medical Leave Act ("FMLA"); and two counts of retaliation under Oregon Revised Statute § ("ORS") 659A.030(1)(f).[1] Notice of Removal Ex. 1, ¶¶ 39–54, 83–94, ECF No. 1-1.[2] Defendant moves for summary judgment on Plaintiff's claims under Federal Rule of Civil Procedure 56. Def.'s MSJ 1. For the following reasons, the Court grants Defendant's Motion for Summary Judgment.

## BACKGROUND

This case arises out of Plaintiff's termination as Clinic Manager at Defendant's Northeast Internal Medicine Clinic (the "Clinic"). Plaintiff worked as Clinic Manager at the Clinic from July 2012 to December 2022. Heisen Decl. Ex. 1, at 1, ECF No. 28-1; Totten Decl. Ex. 1, at 8:8–16,[3] ECF No. 24-1. Plaintiff was responsible for supporting and leading a busy staff. Totten Decl. Ex. 1, at 14:8–10. Plaintiff was supervised by a Director of Primary Care—first Maryna Thompson, then Trish Mason, and then Heather Crownhart. *Id.* at 11:1–7; Potter Decl. Ex. 3, at 11:12–12:1, ECF No. 29-3. It is unclear exactly when Mason replaced Thompson, but Crownhart replaced Mason in September 2022. Totten Decl. Ex. 3, at 8:8–9:1,[4] ECF No. 24-3. Plaintiff also

---

[1] In 2025, ORS 659A.030(1)(f) was renumbered without textual revision to ORS 659A.030(1)(g). *See* H.B. 3187, 83rd Or. Legis. Assemb., 2025 Reg. Sess. (Or. 2025). Because both parties continue to use ORS 659A.030(1)(f), the Court also uses ORS 659A.030(1)(f) throughout this Opinion & Order. *See* Def.'s Mot. Summ. J. ("Def.'s MSJ") 28 n.22, ECF No. 19; Pl.'s Mem. Opp'n Def.'s MSJ ("Pl.'s Opp'n") 35 n.7, ECF No. 26.

[2] Plaintiff concedes her third, fourth, fifth, and seventh claims for relief. Pl.'s Opp'n 5 n.1. Plaintiff also conceded her sixth claim for relief at Oral Argument on May 11, 2026.

[3] All citations to "Totten Decl. Ex. 1" refer to the "Exhibit" page number located at the bottom right corner of each page—not the deposition page number.

[4] All citations to "Totten Decl. Ex. 3" refer to the "Exhibit" page number located at the bottom right corner of each page—not the deposition page number.

worked with Medical Director, Steven Seres. Potter Decl. Ex. 7, at 18:3–19:8, ECF No. 29-7. Seres was supervised by Julie Yeggy and was peer to Plaintiff. Crownhart Decl. ¶ 7, ECF No. 22. Peter Tranby was also relevant to Plaintiff's termination; Tranby is employed by Defendant as an Employee Relations Consultant. Tranby Decl. ¶ 3, ECF No. 20. A snapshot of an organizational chart from March 2022 can be found at Potter Decl. Ex. 1, at 1, ECF No. 29-1.

## I.    Performance Reviews

From 2014 to 2022, Plaintiff received annual leadership performance reviews. *See* Totten Decl. Ex. 1, at 157–69 (Plaintiff's "FY14 Leadership Performance Review"); *id.* at 171–82 (Plaintiff's "FY15 Leadership Performance Review"); Heisen Decl. Ex. 2, at 1–12, ECF No. 28-2 (Plaintiff's "FY16 Leadership Performance Review"); *id.* at 13–23 (Plaintiff's "FY17 Leadership Performance Review"); Potter Decl. Ex. 1, at 32–42 (Plaintiff's "FY18 Leadership Performance Review"); *id.* at 44–54 (Plaintiff's "FY19 Leadership Performance Review"); *id.* at 56–61 (Plaintiff's "FY20 Leadership Performance Review"); *id.* at 62–69 (Plaintiff's "FY21 Leadership Performance Review"); *id.* at 70–77 (Plaintiff's "FY22 Leadership Performance Review").

In 2014, Plaintiff received mixed feedback. Anonymous peers commented that Plaintiff "has a lot of good ideas to help run a smooth clinic" and that Plaintiff "continuously is looking for ways to improve the quality of patient care." Totten Decl. Ex. 1, at 158. Others, however, commented that Plaintiff's family-like approach to managing staff can be ineffective and that she has trouble implementing ideas. *Id.* In 2015, Plaintiff received similar feedback. Plaintiff's supervisor Thompson commented that Plaintiff's "level of engagement has varied" and that "staff lost trust and confidence" with Plaintiff. *Id.* at 177–78. Anonymous peers, however, commented that Plaintiff "is a good manager" and "has a great sense of teamwork." *Id.* at 172.

3 – OPINION & ORDER

On June 22, 2015, Plaintiff received a performance improvement plan. *Id.* at 35:12–15, 183–86. Plaintiff's performance improvement plan had two objectives: communication and human resource management. *Id.* at 183–84. Plaintiff took the feedback seriously and improved on the plan's objectives. *Id.* at 41:15–42:1. Eventually, Plaintiff successfully completed the plan. *Id.* at 42:2–6.

From 2016 to 2022, Plaintiff received mostly positive feedback. For example, in 2016, Thompson stated that Plaintiff's efforts to improve her manager effectiveness score paid off and that Plaintiff "improved on every dimension[,]" gaining "the trust and confidence of her team and her providers." Heisen Decl. Ex. 2, at 5, 8. Anonymous peers further commented that Plaintiff "made strides in improving clinic morale and promoting team work" and that Plaintiff "[h]as improved and grown into the leadership position[.]" *Id.* at 2, 4. In 2017, Plaintiff again received high praise, including Thompson commenting that Plaintiff "does an exceptional job of making sure her staff are supported and provided with opportunities to grow[,]" and anonymous peers commenting that Plaintiff "has helped build a good team that works well together." *Id.* at 17, 20. Anonymous peers did, however, comment that Plaintiff still needs to make "sure she follows through on details and what she says she will do" and that Plaintiff's "unplanned time away . . . can have a negative impact on the team." *Id.* at 21.

In 2018, Plaintiff's new supervisor Mason commented that Plaintiff "is a very strong leader that models the 'Legacy leadership' competencies." Potter Decl. Ex. 1, at 38. Similarly in 2019, Mason commented that Plaintiff "is an outstanding leader and is very knowledgeable." *Id.* at 51. And in 2020, Mason commented, "I am very honored to have [Plaintiff] on my leadership team." *Id.* at 60. In 2021, in the midst of the COVID pandemic, anonymous peers commented that Plaintiff "has done a great job this last year with the COVID pandemic supporting the staff,

4 – OPINION & ORDER

while still keeping them accountable and moving forward on our clinic initiatives." *Id.* at 67. And in 2022, anonymous peers commented that Plaintiff "has been an outstanding manager and has always stepped up to every challenge that has came [sic] her way between being extreme short staff [sic] and the pandemic over the past two years." *Id.* at 71.

## II.    2022

In the spring of 2022, Plaintiff received knee replacement surgery. Heisen Decl. ¶ 4, ECF No. 28. Plaintiff thus took medical leave until mid-August—first, intermittent medical leave from March 31, 2022, to May 4, 2022, and then continuous medical leave. *Id.*; Totten Decl. Ex. 1, at 47:22–24. Plaintiff did not return to work until August 15, 2022. *See* Potter Decl. Ex. 11, ECF No. 29-11 ("Clinic Manager's first day back from leave."); Potter Decl. Ex. 8, at 77:6–9, ECF No. 29-8.

On August 1, 2022, prior to returning from leave, Plaintiff stopped by the Clinic. Potter Decl. Ex. 7, at 47:25–48:8. The next day, Seres emailed Plaintiff's supervisor Mason. Potter Decl. Ex. 1, at 148; Potter Decl. Ex. 7, at 47:9–14. In that email, Seres voiced a few things that had him concerned about Plaintiff's return to work. *See* Potter Decl. Ex. 1, at 148. Mason subsequently spoke to Plaintiff about setting expectations for boundaries between Plaintiff and Seres. Potter Decl. Ex. 3, at 68:24–69:13. Mason later texted Seres that her conversation with Plaintiff "went as well as could be expected from [Plaintiff]." Potter Decl. Ex. 1, at 103; Potter Decl. Ex. 3, at 68:3–23.

On one of Plaintiff's first days back at work, however, Plaintiff went into Seres' office, closed the door, and became emotional. Totten Decl. Ex. 1, at 49:8–10; Totten Decl. Ex. 5, at

5 – OPINION & ORDER

10:7–16, 11:2–8,[5] ECF No. 24-5. Plaintiff was upset with how things had changed since returning to work—specifically Seres' treatment of Plaintiff. Totten Decl. Ex. 1, at 49:11–15. Plaintiff also told Seres that she thought there were spies in the Clinic watching and reporting on her. *Id.* at 50:4–10. Within Plaintiff's first week back, she also asked Seres whether Seres thought Plaintiff was a good manager. *Id.* at 52:24–53:3. Regardless, Plaintiff and Seres still had to work together to do their jobs. Potter Decl. Ex. 4, at 82:6–14, ECF No. 29-4. Seres, however, stopped greeting Plaintiff in the morning, despite generally greeting other staff. Potter Decl. Ex. 7, at 128:19–129:5. Seres also suggested to certain employees at the Clinic that they make complaints about Plaintiff to management. *Id.* at 135:4–10. Plaintiff's supervisor Yeggy even had the perspective that Seres was trying to get Plaintiff removed as Clinic Manager in the last six months of 2022. Potter Decl. Ex. 6, at 24:6–10, ECF No. 29-6.

On August 22, 2022, Seres emailed Mason referring to some "highlights" of Plaintiff's conduct, including that Plaintiff continued to ask Seres whether he thought Plaintiff was doing a good job, that Plaintiff said she was not leaving, and that Plaintiff "pantomimed" that Seres was a backstabber. Potter Decl. Ex. 1, at 201–02; Potter Decl. Ex. 7, at 110:17–111:10. Again, on September 8, 2022, Seres emailed Mason, as well as Crownhart, with more concerns about Plaintiff. Potter Decl. Ex. 1, at 203; Potter Decl. Ex. 7, at 118:9–15. Seres also texted Mason that day referencing another staff member's comment that their "enjoyment at work [went] down significantly with the awkwardness of [Plaintiff's] return[.]" Potter Decl. Ex. 1, at 81; Potter Decl. Ex. 7, at 132:10–133:20.

---

[5] All citations to "Totten Decl. Ex. 5" refer to the "Exhibit" page number located at the bottom right corner of each page—not the deposition page number.

6 – OPINION & ORDER

On September 12, 2022, Seres and Mason met, with Tranby taking notes. Potter Decl. Ex. 7, at 146:11–21; Potter Decl. Ex. 1, at 204–07. Tranby's notes reflect that Seres said Plaintiff "needs a new start somewhere else" but that Seres had "no evidence of [Plaintiff] doing a bad job since she came back." Potter Decl. Ex. 1, at 206; Potter Decl. Ex. 2, at 56:21–57:22, ECF No. 29-2. Two days later, on September 14, 2022, Mason emailed her supervisor that she and Crownhart had been working with Tranby "regarding some feedback/concerns Dr. Seres recently shared in relation to [Plaintiff's] return from FMLA." Potter Decl. Ex. 1, at 13; Potter Decl. Ex. 5, at 11:11–14, 13:14–24, ECF No. 29-5. Mason indicated Seres reported that Plaintiff violated the boundaries Mason set prior to Plaintiff returning to work. Potter Decl. Ex. 1, at 13. Later that day, Mason and Crownhart met with Seres, with Tranby taking notes. Potter Decl. Ex. 1, at 12; Potter Decl. Ex. 2, at 75:1–75:16; Potter Decl. Ex. 7, at 150:16–151:6. Tranby's notes reflect that Seres said that "other than everyone leaving and the way [Plaintiff] has been acting . . . as far as I know no performance related issues." Potter Decl. Ex. 1, at 12; Potter Decl. Ex. 2, at 75:17–23. In mid-September 2022, Seres began a leave of absence. Potter Decl. Ex. 7, at 151:7–10.

On September 27, 2022, employee Miller emailed Crownhart about Plaintiff. Potter Decl. Ex. 1, at 14–15; Potter Decl. Ex. 4, at 91:25–92:5. Miller wrote that Plaintiff does not "seem like her normal self" and that Plaintiff "has been struggling emotionally recently . . . ." Potter Decl. Ex. 1, at 14. Miller attributed this to "the numerous meetings" Plaintiff had been having recently. *Id.* Miller also wrote that three new staff members chose to work at the Clinic in part due to their connection with Plaintiff in their interviews. *Id.*

On October 1, 2022, before Seres returned from leave, Seres emailed his supervisor Yeggy expressing more concerns regarding Plaintiff. Potter Decl. Ex. 1, at 191–92; Potter Decl. Ex. 7, at 158:15–159:2. Yeggy forwarded the email to Tranby who in turn responded that, among

7 – OPINION & ORDER

other things, "[i]f [Seres] stays in the med director role, . . . then there will need to be very clear expectations laid out for him as well, as he easily could be putting legacy and himself at risk for targeting the manager/creating a hostile work environment/retaliation/trying to get her fired[.]" Potter Decl. Ex. 1, at 190–91. On October 10, 2022, when Seres returned to work, Yeggy and Crownhart met with Seres. Potter Decl. Ex. 12, ECF No. 29-12; Potter Decl. Ex. 4, at 125:7–16. Notes from that meeting indicate that Tranby's concerns regarding Seres potentially creating a hostile work environment may have been addressed. Potter Decl. Ex. 12, at 1; Potter Decl. Ex. 2, at 92:17–93:17; Potter Decl. Ex. 4, at 129:14–19. Seres also expressed a willingness to work with a mediator. Potter Decl. Ex. 12, at 2; Potter Decl. Ex. 7, at 173:3–17.

On October 11, 2022, Yeggy forwarded to Tranby and Crownhart a text message from Seres in which Seres relayed comments from other staff that Plaintiff felt she was being bullied. Potter Decl. Ex. 1, at 18–19; Potter Decl. Ex. 6, at 26:23–27:21. Tranby responded the next day that Seres needs to stop engaging with staff about concerns about Plaintiff and instead direct the staff to the proper resource. Potter Decl. Ex. 1, at 18. Yeggy assumes she communicated Tranby's message to Seres. Potter Decl. Ex. 6, at 27:23–28:11. On October 12, 2022, however, Seres again relayed staff concerns to Yeggy, Crownhart, and Tranby. Potter Decl. Ex. 1, at 200; Potter Decl. Ex. 7, at 175:25–176:7. Yeggy responded to Seres shortly thereafter: "To be clear, if someone comes to you with concerns of [Plaintiff] you need to stop them from expressing those concerns to you and redirect them to [Crownhart]. We need to keep you out of this." Potter Decl. Ex. 1, at 199.

On or about October 26, 2022, a mediator met with Plaintiff and Seres one on one. *See id.* at 27. The mediator recommended "compassionate transition for [Plaintiff] into another position in Legacy." *Id.* The mediator felt that the situation was "too far aged to repair" and

recommended that Plaintiff and Seres "reduce their time in person" considering the effect it was having on the Clinic. *Id.* The mediator also noted that Plaintiff said she wanted to stay at Legacy but preferred another position. *Id.* The next day, in a meeting between Plaintiff, Crownhart, and Tranby, Plaintiff indicated that she wanted to stay at the Clinic. *See id.* at 26 ("I don't want to leave."); Potter Decl. Ex. 2, at 117:14–21. Crownhart texted Yeggy this information to which Yeggy responded: "Triple uggh[.]" Potter Decl. Ex. 1, at 170; Potter Decl. Ex. 4, at 169:24–171:19. Tranby also later emailed the mediator, Crownhart, and Yeggy that "[w]e cant [sic] just remove [Plaintiff] until [corrective action] steps have been taken . . . ." Potter Decl. Ex. 15, at 1, ECF No. 29-15. Tranby's email was in response to Plaintiff declining to leave her Clinic Manager position. *See id.*

## III.    Staff Complaints

Crownhart received various employee complaints concerning Plaintiff in 2022. For example, on October 12, 2022, employee Smith reported that in an exit interview, the exiting employee stated that "[Plaintiff] is out too much and doesn't provide enough oversite [sic] and responsiveness to needs" and that concerns "are just being dropped even after they have been brought to [Plaintiff's] attention[.]" Crownhart Decl. Ex. 1, ECF No. 22-1. On October 28, 2022, employee Monroe also emailed that since Plaintiff returned from leave, there was "a great amount of disorganization" and that staff were leaving/considering leaving the Clinic. Crownhart Decl. Ex. 4, at 1–2, ECF No. 22-4.

On October 18, 2022, employee Bray emailed Crownhart about an incident with Plaintiff in which Plaintiff told Bray to do her job in front of three other employees. Crownhart Decl. Ex. 6, at 2, ECF No. 22-6. Plaintiff denies this incident occurred, Totten Decl. Ex. 1, at 80:22–81:1, 81:14–82:11, but Crownhart and Tranby followed up with Bray on October 19, 2022, Crownhart

Decl. ¶ 16; Tranby Decl. ¶ 8. Tranby's notes from that meeting indicate that Bray felt embarrassed about the incident and did not think it was professional; Bray did not feel supported. Tranby Decl. Ex. 3, at 1, ECF No. 20-3.

On October 21, 2022, employee Parr reported the incident between Plaintiff and Bray, as well a separate incident in which Plaintiff recommended a course of action which Parr considered to be a "HIPAA violation . . . ." Crownhart Decl. Ex. 7, at 1–2, ECF No. 22-7. On October 28, 2022, employee Lebeck also reported the incident between Plaintiff and Bray. Crownhart Decl. Ex. 5, ECF No. 22-5. Lebeck also generally noted that over the past two months morale in the Clinic had dropped, and the Clinic felt chaotic. *Id.*

On October 21, 2022, Crownhart met with Plaintiff regarding the incident with Bray. Crownhart Decl. ¶ 18. Plaintiff felt harassed in that meeting. Totten Decl. Ex. 1, at 85:6–21.

On October 31, 2022, Crownhart notified Plaintiff that an employee expressed concern about a comment made by Plaintiff in a morning huddle. Crownhart Decl. ¶ 19; Totten Decl. Ex. 1, at 110:16–21.. And on November 4, 2022, a physician contacted Crownhart regarding workflow concerns at the Clinic. *Id.* ¶ 20. Crownhart followed up with the physician to which the physician expressed he was upset with Plaintiff's response to his concern. *Id.*

## IV.    Written Corrective Action

By October 28, 2022, and in light of the staff complaints and Plaintiff's refusal to leave her Clinic Manager position, Crownhart and Tranby drafted a Written Corrective Action ("WCA"). *See* Crownhart Decl. ¶ 23; Potter Decl. Ex. 15, at 1 (Tranby emailing "we are moving forward" on the "corrective action path"); Potter Decl. Ex. 1, at 175 (Crownhart texting Yeggy she is "working on the corrective action document"). The WCA was finalized and delivered remotely to Plaintiff on November 7, 2022. Crownhart Decl. ¶ 23; Totten Decl. Ex. 1, at 101:2–

10 – OPINION & ORDER

5; Potter Decl. Ex. 4, at 173:8–16. The WCA identified various performance concerns, including presence in the Clinic, professionalism, communication, organization, and Clinic operations. Potter Decl. Ex. 1, at 28. The WCA specifically identified four dates when Plaintiff was absent for some part of the day. *Id.* at 29. The WCA identified expectations for Plaintiff, including that Plaintiff demonstrate presence, maintain professional communications, respect boundaries, and lead effectively. *Id.* at 30. In considering whether to issue the WCA, Crownhart did not review Plaintiff's prior performance reviews. Potter Decl. Ex. 4, at 186:21–187:1. Crownhart did not interview other staff besides those identified by Seres or those who reached out to Crownhart or Yeggy directly. *Id.* at 147:23–148:13. And Crownhart did not consider the portion of employee Miller's September 27, 2022 email in which she states that three new staff members chose to work at the Clinic in part due to their connection with Plaintiff. *Id.* at 190:22–191:6; *see also* Potter Decl. Ex. 1, at 14–15 (employee Miller's September 27, 2022 email).

Also on November 7, 2022, prior to Crownhart and Tranby delivering the WCA to Plaintiff, Plaintiff told Crownhart and Tranby that she was filing a grievance against them. Potter Decl. Ex. 8, at 195:15–22; Totten Decl. Ex. 1, at 97:19–98:2. Tranby responded by getting "very angry" and saying "do you think this is the right time to tell us that." Totten Decl. Ex 1, at 98:3–4. Tranby got louder and asked Plaintiff to read a section of the harassment policy. *Id.* at 98:6–16. Tranby was "yelling" at Plaintiff. *Id.* at 99:1–2. Regardless, on November 7, 2022, Plaintiff submitted her grievance letter. *Id.* at 116:12–18, 200–01. Plaintiff's letter stated that after Plaintiff's knee surgery and as she was getting ready to return from leave, Plaintiff could tell the tone of Mason and Seres "had changed and [she] did not feel welcomed back." *Id.* at 200. Indeed Plaintiff's "office had been rearranged and some personal items were taken down." *Id.* Moreover, Plaintiff generally felt that ever since returning from leave, she "felt retaliated

11 – OPINION & ORDER

against." *Id.* at 201; *see also id.* at 200 ("It was apparent at this time they did not want me back."). For example, Plaintiff was required to attend more meetings with Mason and Crownhart despite the meetings not having much substance. *Id.* at 200. On December 8, 2022, Defendant responded to Plaintiff's grievance, stating that Defendant "conducted a thorough investigation" but was "unable to substantiate [Plaintiff's] allegations." *Id.* at 202.

After the WCA was delivered, Crownhart received more staff complaints. For example, on November 9, 2022, employee Blood emailed Crownhart with "grievances" regarding Plaintiff, including that Plaintiff dismissed Blood's workplace concerns, Plaintiff had yelled at Blood to get back to work in front of other staff, and Plaintiff made uncomfortable comments to Blood. Crownhart Decl. Ex. 8, at 2–3, ECF No. 22-8. Crownhart also performed a series of "rounding interviews" with staff. Crownhart Decl. ¶ 25. Specifically, Crownhart interviewed employee Blood on November 9, 2022, Crownhart Decl. Ex. 9, ECF No. 22-9, employee Monroe on November 9, 2022, Crownhart Decl. Ex. 10, ECF No. 22-10, and employee Lebeck on November 10, 2022, Crownhart Decl. Ex. 11, ECF No. 22-11. Blood commented that Plaintiff was failing as a manager, played favorites, and avoided conflict. Crownhart Decl. Ex. 9, at 1. Monroe commented that training and onboarding for new staff was disorganized, and daily huddles felt punitive. Crownhart Decl. Ex. 10, at 1–2. Lebeck commented that the Clinic felt chaotic, there was a constant level of tension, and people were looking for new jobs. Crownhart Decl. Ex. 11, at 1–2.

On November 22, 2022, Crownhart interviewed employee Dean. Crownhart Decl. Ex. 12, ECF No. 22-12. Dean commented that Plaintiff is "[n]ot always available[,]" Plaintiff and a staff member are laughing in Plaintiff's office, and that Plaintiff goes around the office with her phone showing pictures. *Id.* at 2–3. On November 29, 2022, Seres reported that two employees—

12 – OPINION & ORDER

Monroe and Tuy—came to see Seres "in tears" about interactions they had with Plaintiff. Crownhart Decl. Ex. 13, at 2, ECF No. 22-13. Crownhart followed up with each of them. In Crownhart's conversation with Monroe, Monroe stated that Plaintiff had a closed-door conversation with Plaintiff during which Plaintiff asked, "do people blame me?" and "what should I do?" *Id.* at 1. Monroe felt these questions were inappropriate and was concerned with Plaintiff's boundaries. *Id.* In Crownhart's follow-up conversation with Tuy, Tuy reported staff leaving the Clinic due to management, and that there was a lack of communication and organization in the Clinic. Crownhart Decl. Ex. 14, at 1, ECF No. 22-14. On December 7, 2022, Crownhart interviewed Monroe again, this time relating to a different incident in which Plaintiff invited Monroe into a meeting with Seres to discuss disciplinary action relating to a separate employee. Crownhart Decl. Ex. 15, ECF No. 22-15. Monroe felt "groomed" by Plaintiff in the conversation and that Plaintiff "was trying to get support for the situation." *Id.* at 2.

## V.    Final Corrective Action

By December 20, 2022, a Final Corrective Action ("FCA") was prepared. Totten Decl. Ex. 1, at 203–05 (Final Corrective Action); Potter Decl. Ex. 4, at 201:21–202:4. Crownhart discussed with Tranby whether to issue the FCA, but it was ultimately Crownhart's decision to issue it. *Id.* at 203:12–15; Potter Decl. Ex. 2, at 175:15–20. In preparing the FCA, Crownhart did not review Plaintiff's prior performance reviews or give weight to employee Miller's email about the recent hires who joined the Clinic in part due to their connection with Plaintiff. Potter Decl. Ex. 4, at 187:23–188:4; 190:22–191:6. On December 28, 2022, Crownhart and Tranby met with Plaintiff remotely to deliver the FCA. Totten Decl. Ex. 1, at 125:17–24; 126:5–21, 203. The FCA cited new incidents arising after the WCA, including six unplanned absences and four instances of Plaintiff leaving the Clinic early. *Id.* at 203. The FCA also cited Plaintiff's failure to create

13 – OPINION & ORDER

and maintain professional workplace boundaries and failure to maintain professional behaviors. *Id.* at 204–05. The FCA specifically cited the incident in which Plaintiff invited Monroe into a meeting with Seres to discuss disciplinary action relating to another employee. *Id.* at 203; *see also* Crownhart Decl. Ex. 15 (meeting notes with employee Monroe). As a result of the FCA, Plaintiff's role as Clinic Manager was discontinued and Plaintiff was given thirty days of continued employment—ten days paid—to apply for other positions within Legacy. Totten Decl. Ex. 1, at 205.

By January 13, 2023, Plaintiff received an offer letter for a full-time position with a different employer with an anticipated start date of January 23, 2023. *Id.* at 145:5–12, 145:21–146:4, 208–09. Plaintiff, however, did not inform Defendant about her new position until February 2, 2023. *Id.* at 144:12–17, 207. That same day, Crownhart ended Plaintiff's employment, though Crownhart extended Plaintiff's benefits for another month. *Id.* at 207.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28

14 – OPINION & ORDER

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl*, 658 F.3d at 1112. If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Defendant moves for summary judgment on Plaintiff's OFLA and FMLA interference claims, as well as Plaintiff's ORS 659A.030(1)(f) retaliation claims. Def.'s MSJ 20–22, 28–33. The Court finds summary judgment appropriate. Accordingly, the Court grants Defendant's Motion.

## I.    OFLA & FMLA

The OFLA "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the [FMLA]." ORS 659A.186(2). "Thus, a claim for interference under the OFLA largely resembles an interference claim under the FMLA." *Johnson v. Jondy Chems., Inc.*, No. 3:16-cv-01734-MO, 2017 WL 1371271, at *4 (D. Or. Apr. 13, 2017). Here, the parties do not dispute that Plaintiff's OFLA and FMLA interference claims should be considered together. *See* Def.'s MSJ 21; Pl.'s Opp'n 28. Accordingly, the Court analyzes them together. *See, e.g., Canning v. Washington Cnty.*, 781 F. Supp. 3d 1103, 1114 (D. Or. 2025) (analyzing the

15 – OPINION & ORDER

plaintiff's OFLA and FMLA claims together); *Kelly v. Boeing Co.*, 400 F. Supp. 3d 1093, 1110–11 (D. Or. 2019) (same), *aff'd*, 848 F. App'x 692 (9th Cir. 2021).

To prevail on an interference claim, "a plaintiff must show by a preponderance of the evidence that: (1) the plaintiff took or requested protected leave; (2) the employer subjected the plaintiff to an adverse employment action; and (3) the taking of or requesting protected leave was a negative factor in the adverse employment decision." *Schultz v. Wells Fargo Bank, Nat. Ass'n*, 970 F. Supp. 2d 1039, 1053 (D. Or. 2013) (internal quotation marks omitted). "A plaintiff may prove an interference claim 'by using either direct or circumstantial evidence, or both.'" *Id.* (quoting *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001)); *see also Reaves v. Nexstar Broad., Inc.*, 327 F. Supp. 3d 1352, 1374 (D. Or. 2018) ("Plaintiff must show, by a preponderance of circumstantial or direct evidence, . . . that he engaged in protected activity, was subject to negative consequences, and a causal link between the two.").

Defendant argues that Plaintiff fails to establish the third element of her OFLA and FMLA interference claims. *See* Def.'s MSJ 21 ("Plaintiff lacks facts supporting a causal link between her protected leave and the [adverse employment actions]."). The Court agrees.

To establish a causal link, a plaintiff must present either direct or circumstantial evidence that the taking of OFLA and FMLA leave "constituted a negative factor" in the adverse employment action. *Bachelder*, 259 F.3d at 1125. Temporal proximity between the exercise of leave and the adverse employment action supports a finding of causation; however, temporal proximity alone is insufficient. *Carter v. Fred Meyer Jewelers, Inc.*, No. 3:16-cv-00883-YY, 2019 WL 2744190, at *4 (D. Or. Apr. 10, 2019), *report and recommendation adopted*, No. 3:16-cv-00883-YY, 2019 WL 3206831 (D. Or. July 16, 2019); *see also Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003) ("[T]he proximity in time between the leave and . . . termination

16 – OPINION & ORDER

also provides supporting evidence of a connection between the two events."). Moreover, "[w]here termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly 'susceptible of abuse and more likely to mask pretext.'" *Xin Liu*, 347 F.3d at 1136–37 (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)).

Here, Plaintiff does not submit direct evidence that her taking of protected leave was a negative factor in Defendant's adverse employment actions—i.e., the FCA, cutting off her compensation ten working days later, and Plaintiff's eventual termination. *See* Notice of Removal Ex. 1, ¶¶ 42, 50. Instead, Plaintiff argues that the proximity in time between Plaintiff's protected leave and Defendant's adverse employment actions, the deviation from Plaintiff's previous performance reviews, Crownhart's failure to consider Plaintiff's performance reviews to prepare the FCA, the subjective criteria used in the FCA, and Crownhart's purported decision to terminate Plaintiff before receiving relevant evidence, together, create a triable issue as to whether Plaintiff's taking of protected leave was a *negative factor* in Defendant's adverse employment actions. Pl.'s Opp'n 30–35. The Court disagrees.

First, the temporal proximity between Plaintiff taking protected leave (March 2022 through mid-August 2022), Heisen Decl. ¶ 4; Totten Decl. Ex. 1, at 47:22–24, and delivery of the FCA (December 28, 2022), Totten Decl. Ex. 1, at 203, is long (over four months) and does not support a causal link. This is unlike the temporal proximity in *Carter*, 2019 WL 2744190, at *4—in which the plaintiff was suspended the day he returned from leave and terminated two days later—or the temporal proximity in *Mathieson v. Yellow Book Sales & Distrib. Co.*, No. CIV. 07-6090-AA, 2008 WL 2889398, at *7 (D. Or. July 21, 2008)—in which the plaintiff was terminated a week before he returned from leave. Moreover, even if temporal proximity

17 – OPINION & ORDER

supported causation here, that alone is insufficient: "Temporal proximity must be accompanied by direct or circumstantial evidence that FMLA leave was considered as a factor in termination." *Carter*, 2019 WL 2744190, at *4.

Second, although characterization of Plaintiff's performance in the final months of 2022 deviated from Plaintiff's generally positive past performance reviews, some of the concerns raised in late 2022 are consistent with critiques Plaintiff received over the years. For example, in Plaintiff's FCA, Plaintiff was noted as having attendance issues and failing to meet expectations regarding professional workplace boundaries. Totten Decl. Ex. 1, at 203–04. Plaintiff received similar critiques in earlier performance reviews. For example, in 2022, anonymous peers commented that Plaintiff "doesn't seem to have a finger on the pulse of the [C]linic" because of "the amount of time that [Plaintiff] is not physically present in the [C]linic." Potter Decl. Ex. 1, at 73. Also in 2022, anonymous peers commented that Plaintiff needs to "[k]now when to be herself on meeting calls and when to be serious as she never knows who is on that call." *Id.* In 2021, anonymous peers commented that attendance for Plaintiff can be an issue and that it is frustrating when Plaintiff takes unscheduled absences. *Id.* at 68. In 2019, anonymous peers commented that Plaintiff "is not always present when it seems times are tough." *Id.* at 52. In 2017, anonymous peers commented that Plaintiff's "unplanned time away from the [C]linic can have a negative impact on the team." Heisen Decl. Ex. 2, at 21. And in 2015, anonymous peers commented that Plaintiff "needs to be conscious [about] some of her off hand comments made in public area" and that Plaintiff needs to "consider any comments in the center of the [C]linic before she says them." Totten Decl. Ex. 1, at 173.

Considering Plaintiff was previously critiqued about her availability and professionalism in past performance reviews, Plaintiff's argument that her critiques in the FCA "markedly

18 – OPINION & ORDER

differ[]" from past performance is less persuasive. Pl.'s Opp'n 32. Indeed, this case is unlike *Xin Liu* where, after back-and-forth between the employee and employer regarding leave extensions and the employee's return date, the employer gave the employee a "19% drop" on her overall score in her performance evaluation. 347 F.3d at 1130–31. There, the court found that the drop in the employee's performance evaluation created "an inference of impermissible motivation." *Id.* at 1137. From the facts presented here, the Court disagrees that a similar inference can be drawn.

Third, although Crownhart did not consider Plaintiff's prior performance reviews in her decision to issue the FCA, Potter Decl. Ex. 4, at 186:21–187:4, the Court finds Crownhart's reasoning persuasive. As Crownhart explained, "performance isn't static . . . ." *Id.* at 187:19–20. Thus, the Court finds that Crownhart's failure to review Plaintiff's past performance reviews does not create an inference of impermissible motivation. *See Massucco v. Grp. Health Co-op.*, 255 F. App'x 129, 132 (9th Cir. 2007) (finding, in the context of a Title VII retaliation claim, that the plaintiff's past performance reviews were insufficient to create a jury question as to pretext because they were completed before the incident leading to his eventual resignation).

Fourth, Plaintiff argues that because Crownhart's assessments in the FCA rely on subjective criteria, the Court should draw an inference of pretext. Pl.'s Opp'n at 32–33; *see also Xin Liu*, 347 F.3d at 1136 ("Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly susceptible of abuse and more likely to mask pretext." (internal quotations marks omitted)). Plaintiff specifically relies on the FCA's critiques that Plaintiff did not "follow Legacy's Conduct policy and Values in Action regarding respectful professional communications[,]" and Plaintiff failed to meet expectations for "[c]reating and maintaining professional workplace boundaries . . . ." Totten Decl. Ex. 1, at 203–04; Pl.'s Opp'n 32. Plaintiff

19 – OPINION & ORDER

also argues that her cited failure to satisfy Defendant's "97% attendance policy" is pretext because Defendant's attendance calculation only considered absences during a short period of time; thus, even a single absence would have violated the attendance policy. Pl.'s Opp'n 33; *see also* Totten Decl. Ex. 1, at 203 (calculating absences from "11/8/2022 – 12/16/2022").

Plaintiff's argument, however, ignores the numerous employee complaints Crownhart received—and followed-up on—regarding Plaintiff's professionalism and workplace boundaries—even excluding Seres' complaints. These include employee Smith's email relaying comments from an exiting employee that Plaintiff announced to staff that the exiting employee was not happy, Crownhart Decl. Ex. 1; the incident with employee Bray in which Plaintiff told Bray in front of other staff that they could go "round and round" or Bray could do her job, Crownhart Decl. Ex. 6, at 2; Tranby Decl. Ex. 3, at 1; employee Lebeck's comments that staff had to close the door to Plaintiff's office because of her "raised voice" and that Plaintiff referred to staff as "her kids" or "honey[,]" Crownhart Decl. Exs. 5, 11; employee Blood's comments that Plaintiff yelled at Blood on multiple occasions to get back to work and made uncomfortable comments to Blood such as "Do you love me" and "Mama's here for you[,]" Crownhart Decl. Exs. 8–9; employee Monroe's comments that the daily huddles became "punitive" because of Plaintiff's response to issues raised, Crownhart Decl. Ex. 10, at 2; and employee Monroe's additional comments that Plaintiff involved Monroe in uncomfortable and inappropriate conversations, Crownhart Decl. Exs. 13, 15.[6]

---

[6] To the extent Plaintiff disputes these incidents occurred, such dispute does not create a genuine issue of fact. *See Kelly v. Boeing Co.*, 400 F. Supp. 3d 1093, 1099 (D. Or. 2019) ("When an employer holds a good faith belief that a termination of employment is valid, the employer cannot be liable, even if it is later revealed that the termination was based on a factual mistake or misunderstanding."), *aff'd*, 848 F. App'x 692 (9th Cir. 2021). Here, with respect to the rounding interviews and November feedback, Crownhart understood the employees to "be raising truthful concerns from their perspectives . . . ." Crownhart Decl. ¶ 25; *see also Villiarimo v. Aloha Island*

20 – OPINION & ORDER

Plaintiff's argument about the attendance policy also ignores the fact that Plaintiff had six unplanned absences between November 8, 2022, and December 16, 2022. *See* Totten Decl. Ex. 1, at 203. Thus, even if one unplanned absence would have been sufficient to violate Defendant's attendance policy during this time-period, Plaintiff had six. Any inference of pretext is thus undeserved. Plaintiff further does not dispute her six absences. *See* Totten Decl. Ex. 1, at 133:20–135:9.

For these reasons, the Court disagrees with Plaintiff that Crownhart's assessments in the FCA warrant an inference of impermissible motivation because, even assuming Crownhart relied on subjective criteria, Crownhart had substantial objective evidence to justify such criteria.

Last, to the extent Plaintiff argues that Crownhart decided to terminate Plaintiff before receiving relevant evidence, such argument is contrary to the factual record and insufficient to support an inference of impermissible motivation. Indeed, by the time Crownhart started working on the WCA on October 28, 2022, *see* Potter Decl. Ex. 1, at 175 (text around "10:36 AM"); Potter Decl. Ex. 4, at 137:16–23, and even assuming Crownhart had decided to terminate Plaintiff by that date, Crownhart had received evidence regarding Plaintiff's performance issues—even excluding Seres' complaints, *see, e.g.*, Crownhart Decl. Ex. 1 (employee Smith's October 12, 2022 email); Crownhart Decl. Ex. 6, at 1–2 (employee Bray's October 18, 2022 email); Tranby Decl. Ex. 3 (October 19, 2022, follow-up meeting with employee Bray); Crownhart Decl. Ex. 7, at 1–2 (employee Parr's October 21, 2022 email); Crownhart Decl. Ex. 4 (employee Monroe's October 28, 2022 email at "8:48 AM").

\*\*\*

---

*Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." (internal quotation marks omitted)).

21 – OPINION & ORDER

In sum, even drawing inferences from these facts in the light most favorable to Plaintiff, the Court finds that Plaintiff does not present sufficient circumstantial evidence that the taking of OFLA and FMLA leave was a negative factor in Defendant's decision to issue the FCA, cut off Plaintiff's compensation ten working days later, and eventually terminate Plaintiff. Accordingly, the Court grants Defendant summary judgment as to Plaintiff's OFLA and FMLA interference claims.

## II.    Retaliation

Under ORS 659A.030(1)(f):

It is an unlawful employment practice . . . [f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so.

To establish a prima facie case of retaliation under ORS 659A.030(1)(f), a plaintiff must show that (1) they "engaged in a protected activity;" (2) they were "subjected . . . to an adverse employment action;" and (3) there is a causal link between the protected activity and the adverse employment action. *Wolff v. Tomahawk Mfg.*, 689 F. Supp. 3d 923, 950 (D. Or. 2023). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "legitimate reasons for the adverse employment action." *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1086 (D. Or. 2015). If the defendant articulates legitimate reasons, the burden shifts back to the plaintiff to show that the defendant's reasons are mere pretext. *Id.*

Here, Plaintiff alleges two counts of retaliation under ORS 659A.030(1)(f): pre-termination retaliation (count eight) and retaliatory termination (count nine). Notice of Removal Ex. 1, ¶¶ 83–94. The Court finds summary judgment appropriate for both counts.

///

///

22 – OPINION & ORDER

A.    Count Eight

As to count eight, and as clarified at Oral Argument, Plaintiff asserts the following

protected activity:

> a. defending herself directly to Crownhart and/or Tranby in response to their criticism of her in meetings they conducted with her in September and October, 2022;
>
> b. telling Crownhart and Tranby on November 7, 2022, immediately prior to the start of a meeting with them, that she was filing a formal grievance against them due to their mistreatment of her; [and]
>
> c. filing a grievance against Crownhart and Tranby later on November 7, 2022 . . . .

*Id.* ¶¶ 84(a)–(c). Plaintiff also asserts the following adverse employment action: "Tranby

verbally berating and haranguing her on November 7, 2022 in response to her telling Tranby and

Crownhart that she was going to file a grievance against them due to their mistreatment of

her . . . ." *Id.* ¶ 85(a). Regardless of whether Plaintiff engaged in a protected activity, the Court

finds that Plaintiff fails to establish she was subjected to an adverse employment action—the

second element of her prima facie case.

Under Oregon law, an adverse employment action is one "that is reasonably likely to

deter protected activity, regardless of whether it materially affects the terms, conditions, or

privileges of employment . . . ." Or. Admin. R. ("OAR") 839-005-0125(2)(b). Examples of

adverse employment actions include "termination, dissemination of a negative employment

reference, issuance of an undeserved negative performance review and refusal to consider for

promotion." *Zweizig v. Nw. Direct Teleservices, Inc.*, No. 3:15-cv-02401-HZ, 2017 WL

3725184, at *4 (D. Or. Aug. 29, 2017) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 928

(9th Cir. 2000)); *see also Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v.

Portland State Univ.*, 352 Or. 697, 711, 291 P.3d 658 (2012) ("We agree . . . that federal

23 – OPINION & ORDER

precedent interpreting the antidiscrimination provisions of Title VII can provide useful additional context to aid our analysis of the meaning of ORS 659A.030(1)(f)."). Adverse employment actions must produce "injury or harm[;]" therefore, "petty slights, minor annoyances, and simple lack of good manners" are insufficient. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006).

Here, Defendant's purported adverse employment action occurred after Plaintiff told Crownhart and Tranby on November 7, 2022, that she was filing a grievance against them for harassment and retaliation. Totten Decl. Ex. 1, at 97:12–98:2. After Plaintiff told Crownhart and Tranby, Tranby "got very angry" and said "do you think this is the right time to tell us that." *Id.* at 98:3–4. Tranby got "louder and louder" and again said "answer me. Do you think this is the right time to tell me that." *Id.* at 98:6–11. Eventually, Tranby told Plaintiff to get out a copy of the harassment policy and read it out loud to him. *Id.* at 98:13–19. Plaintiff did, to which Tranby followed up by asking Plaintiff "do you feel like you've been harassed because of that" and "is anything that you're saying right now part of what you just read." *Id.* at 98:19–25. Plaintiff described Tranby as "not in a good state" and "yelling" at Plaintiff. *Id.* at 98:25–99:2. Plaintiff also testified as being "nervous and stressed about everything." *Id.* at 99:7–8.

Although likely inappropriate, the Court finds that Tranby's reaction does not rise to the level necessary for an adverse employment action. In *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000), the Ninth Circuit recognized that harassment as retaliation for engaging in protected activity is actionable so long as "it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Although not every insult or harassing comment constitutes a hostile work environment, repeated derogatory or humiliating statements

24 – OPINION & ORDER

may do so." *Best v. California Dep't of Corr.*, 21 F. App'x 553, 560 (9th Cir. 2001); *see also*

*Ray*, 217 F.3d at 1245 ("To determine whether an environment is sufficiently hostile, we look to

the totality of the circumstances, including the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." (internal quotation

marks omitted)). Here, Tranby's reaction was a one-off incident in which Tranby raised his voice

at Plaintiff. Tranby displayed at most a "simple lack of good manners . . . ." *Burlington*, 548 U.S.

at 68. For this reason, the Court finds that Tranby's conduct was not "reasonably likely to deter

protected activity . . . ." OAR 839-005-0125(2)(b). Accordingly, Plaintiff cannot establish the

second element of her prima facie retaliation claim, and the Court grants Defendant summary

judgment as to count eight.

B.    Count Nine

As to count nine, Plaintiff asserts the same protected activity as that alleged in count

eight. *See* Notice of Removal Ex. 1, ¶ 88 (realleging paragraph "84" for count nine); Pl.'s Opp'n

36 ("In her Ninth Claim, Plaintiff realleged paragraph 84 of her Complaint, which alleged that

she opposed what she in good faith believed were unlawful practices against her . . . ."").

Different from count eight, though, Plaintiff alleges as adverse employment actions the FCA,

Defendant's decision to cut off Plaintiff's compensation ten working days after the FCA, and

Plaintiff's termination on February 2, 2023. *Id.* ¶ 90.

As to Plaintiff's first allegation of protected activity, i.e., "defending herself directly to

Crownhart and/or Tranby in response to their criticism of her in meetings they conducted with

her in September and October, 2022[,]" *id.* ¶ 84(a), the Court finds this insufficient to constitute

protected activity. To constitute protected activity, a plaintiff must "[e]xplicitly or implicitly

25 – OPINION & ORDER

oppos[e] an unlawful practice or what [the plaintiff] reasonably believe[s] to be an unlawful practice . . . ." OAR 839-005-0125(2)(a)(A). Opposing an employer's comments relating to performance is insufficient. *See Arigbon v. Multnomah Cnty.*, No. Cv. 09-311-PK, 2010 WL 2038839, at *18 (D. Or. May 20, 2010) (holding that opposing comments regarding performance issues, among other things, was insufficient to constitute protected activity). Here, to the extent Plaintiff defended herself in response to criticism by Crownhart and Tranby, such conduct is insufficient to constitute protected activity because it does not "refer[] to some practice by [Defendant] that is allegedly unlawful." *Sereno-Morales v. Cascade Food Inc.*, 819 F. Supp. 2d 1148, 1153 (D. Or. 2011) (quoting *Maxwell v. Kelly Servs.*, 730 F. Supp. 2d 1254, 1270 (D. Or. 2010)).[7]

As to Plaintiff's second and third allegations of protected activity, i.e., "telling Crownhart and Tranby . . . that she was filing a formal grievance against them due to their mistreatment of her[,]" and "filing a grievance against Crownhart and Tranby[,]" Notice of Removal Ex. 1, ¶¶ 84(b)–(c), the Court finds that Plaintiff establishes her prima facie case as to this conduct. Plaintiff "[e]xplicitly [and] implicitly" opposed what Plaintiff reasonably believed to be an "unlawful practice," OAR 839-005-0125(2)(a)(A); Plaintiff was subjected to employment actions that are "reasonably likely to deter protected activity," i.e., the FCA, cutting off of compensation, and eventual termination, OAR 839-005-0125(2)(b); and the adverse employment actions "are not completely unrelated" to the protected activity, *Wolff*, 689 F. Supp. 3d at 950 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007)).

---

[7] Plaintiff further does not elaborate on the factual circumstances concerning this allegation in her opposition brief.

26 – OPINION & ORDER

Nonetheless, the Court finds Plaintiff cannot show that Defendant's legitimate reasons for its adverse employment actions are pretext for retaliation. *See id.* ("If the defendant [articulates a legitimate nondiscriminatory reason for the challenged actions,] the plaintiff must show that the reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." (internal quotation marks omitted)). As discussed in the Court's analysis regarding Plaintiff's OFLA and FMLA claims, Defendant had legitimate nonretaliatory reasons for its adverse employment actions, including issues with Plaintiff's attendance and professional workplace boundaries. *See* Discussion *supra*, Section I. Plaintiff argues that the evidence she uses to support her OFLA and FMLA claims also supports pretext for her retaliation claim. *See* Pl.'s Opp'n 37. For the reasons discussed above, however, the Court disagrees; Plaintiff's evidence does not persuade the Court that a discriminatory reason more likely motivated Defendant or that Defendant's explanation for its adverse employment actions is unworthy of credence.

For these reasons, the Court grants Defendant summary judgment as to count nine.

## CONCLUSION

The Court GRANTS Defendant's Motion for Summary Judgment [19].

IT IS SO ORDERED.

DATED this _25th_ day of May, 2026.

AMY M. BAGGIO
United States District Judge

27 – OPINION & ORDER